STATE of Wisconsin, Plaintiff-Appellant,

v.

James A. WEBSTER, Defendant-Respondent.

Supreme Court

*Nos. 82–1734–CR, 82–1922–CR, 82–1923–CR.*
*Argued September 9, 1983.—Decided October 4, 1983.*

(Also reported in 338 N.W.2d 474.)

For the plaintiff-appellant the cause was argued by *John D. Niemisto,* assistant attorney general, with *Bronson C. La Follette,* attorney general, on the briefs.

For the defendant-respondent there was a brief by *Stephen J. Menard* and *Eberlein, Gansen & Menard,* Shawano, and oral argument by *Stephen J. Menard.*

Amicus Curiae brief was filed by *Rita Keshena,* Keshena, for the Menominee Indian Tribe, and *Frances Wells, Milton Rosenberg,* of counsel, all of Madison, for the Indian Law Center.

WILLIAM G. CALLOW, J.   This is an appeal from an order of the circuit court for Menominee and Shawano counties, Judge Thomas G. Grover, dismissing for lack of jurisdiction three traffic complaints brought by the State of Wisconsin against the defendant, James A. Webster. The state appealed and petitioned to bypass the court of appeals pursuant to sec. 808.05 and sec. (Rule) 809.60, Stats. We granted the petition to bypass. We affirm the order of the circuit court.

The issue presented on appeal is whether the State of Wisconsin has jurisdiction over Menominee Indians in traffic matters growing out of their use of public highways located within the Menominee Indian Reservation.

On May 2, 1982, James Webster was involved in an automobile accident on State Highway 47, within the boundaries of the Menominee Indian Reservation. Highway 47 is a state highway, built and maintained by the State of Wisconsin for use by the general public. At the time of the incident, Webster was an enrolled member of the Menominee Indian Tribe.

The accident was investigated by the State Highway Patrol. As a result of the investigation, a state patrol officer issued three Wisconsin uniform traffic citations which resulted in the filing of three separate traffic complaints against Webster. The complaints charged

Webster with operating a motor vehicle after revocation, contrary to sec. 343.44, Stats. 1979–80; operating a motor vehicle while under the influence of an intoxicant, contrary to secs. 346.63 and 346.65; and operating a motor vehicle without a valid Wisconsin driver's license, contrary to sec. 343.05.

On June 11, 1982, Webster filed a motion to dismiss the complaints on the ground that the court lacked jurisdiction over him because he was an enrolled member of the Menominee Tribe, and because the alleged violations occurred within the boundaries of the Menominee Indian Reservation.[1] In dismissing the complaints, the trial court held that the state lacked jurisdiction to enforce state traffic laws against the defendant within the Menominee Reservation because such jurisdiction had not been granted to the state by the federal government.

In order to reach the issue presented in this case, it is necessary to trace in some detail the historical application of state jurisdiction to the Menominee Indian Tribe and Reservation. The Menominee Tribe of Indians was granted a reservation in Wisconsin by the Treaty of Wolf River in 1854. 10 Stat. 1064 (1854). By this treaty the Menominees retroceded certain lands they had acquired under an earlier treaty [Treaty of 1849, 9 Stat. 952 (1849)]. The United States granted to the tribe a tract of land along the Wolf River "for a home, to be held as Indian lands are held." 10 Stat. at 1065. *See Menominee Tribe v. United States,* 391 U.S. 404, 405–06 (1968). The Treaty of 1856, 11 Stat. 679 (1856), by which the Menominees sold certain lands to the Stockbridge and Munsee Indians, included the following language:

---

[1] The defendant also asserted as grounds for dismissal a failure to give requisite notice of the charges and a lack of probable cause to issue the charges. We need not address these asserted grounds for dismissal as the trial court dismissed the charges for lack of jurisdiction.

"To promote the welfare and the improvement of the said Menominees, and friendly relations between them and the citizens of the United States . . . . That all roads and highways, laid out by authority of law, shall have right of way through the lands of the said Indians on the same terms as provided by law for their location through lands of citizens of the United States." Treaty of 1856, 11 Stat. at 679–80, Art. 3.

The State of Wisconsin established Highway 47 across the Menominee Reservation by permission of the Secretary of Interior, given pursuant to sec. 4, ch. 832, Act of March 3, 1901 [codified at 25 U.S.C. sec. 311 (1976)].[2]

In August, 1953, the United States Congress enacted Public Law 280, 67 Stat. 588 (1953), which, as amended, became present 18 U.S.C. sec. 1162 (1976). Public Law 280 gave certain states, including Wisconsin, jurisdiction over crimes committed by or against Indians in Indian country within each state. As originally adopted, the law excepted the Menominee Reservation from the grant of jurisdiction to Wisconsin. This situation was short-lived, however, for on June 17, 1954, Congress enacted the Menominee Termination Act, Pub. L. No. 399, 68 Stat. 250 (1954) [codified at 25 U.S.C. secs. 891–902 (repealed)]. The purpose of the Termination Act was "to provide for orderly termination of Federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin." 68 Stat. at 250. Section 10 of the act provided that once title to property had passed from the federal government to a newly formed tribal corporation, "all statutes of the United States which

---

[2] 25 U.SC. sec. 311 (1976) provides, in relevant part:

"The Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation."

affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 68 Stat. at 252. To complete this process, on August 24, 1954, Congress amended 18 U.S.C. sec. 1162 (1976) [Pub. L. No. 661, 68 Stat. 795 (1954)] to strike the Menominee exception, thereby subjecting the Menominee Reservation to the state's criminal jurisdiction as provided by 18 U.S.C. sec. 1162(a).

The transfer of property from the United States to the Menominee Tribe was effectuated when the Termination Plan was published by the Secretary of the Interior in 26 Fed. Reg. 3726 (1961). As part of the Termination Plan, it was noted that "[a]greement has been reached between the United States and the State of Wisconsin with respect to improvement and transfer of roads within the Menominee Reservation."[3] 26 Fed. Reg. at 3728. The plan further provided that "[the Secretary of the Interior] will also issue a deed or deeds to appropriate body or bodies for designated public lands, buildings and roads for school district, county and town." 26 Fed. Reg. at 3729. As a result of these legislative and executive actions, the Menominee Tribe was restored to ownership of its tribal lands but became subject to the state's criminal and civil jurisdiction. However, this state of affairs was again transitory.

On December 22, 1973, Congress repealed the Termination Act by enacting the Menominee Restoration Act, Pub. L. No. 93–197, 87 Stat. 770 (1973) [codified at 25 U.S.C. secs. 903–903f (1976)]. The Restoration Act provided for resumption of tribal status and the return of tribal property to federal trusteeship. The Act, 87 Stat. at 770, provided, in pertinent part:

[3] This agreement is not part of the record in this appeal.

"(b) The Act of June 17, 1954 (68 Stat. 250; 25 U.S.C. secs. 891–902), as amended, is hereby repealed and there are hereby reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to such Act.

"(c) Nothing contained in this Act shall diminish any rights or privileges enjoyed by the tribe or its members now or prior to June 17, 1954, under Federal treaty, statute, or otherwise, which are not inconsistent with the provisions of this Act."

Pursuant to the Restoration Act, the State of Wisconsin retroceded state jurisdiction over the Menominee Reservation by executive proclamation, effective March 1, 1976. *See* 66 Op. Att'y. Gen. 116 (1977).

The first question to be resolved is whether the Menominee's right of occupancy of the land encompassed by the Highway 47 right-of-way was extinguished when the Secretary of the Interior granted the right-of-way to the State of Wisconsin. This court addressed the same question in *State v. Tucker,* 237 Wis. 310, 296 N.W. 645 (1941). *Tucker* involved the issue of whether the state had jurisdiction to prosecute a Menominee Indian, living on the Menominee Reservation, who failed to register his truck and pay a state registration fee. Tucker was cited for operating his truck on that portion of Highway 47 within the boundaries of the reservation without registering his vehicle. In upholding the defendant's conviction for failure to register his truck, this court stated:

"Once the Indian title is perceived to be possessory in character, but subject to extinguishment by the United States, it is obvious that a grant by the United States which destroys this possessory right of the Indians destroys the Indian title. We conclude that this must be the result of the grant to the state of a right of way and permission to maintain a public highway. Such a grant includes by necessary implication the right of the state

to take such possession of the land as will enable it to construct and repair and police the road, and to do all things necessary and incidental to the maintenance of a public highway. . . . After the grant is made, it is quite impossible for the Indians to continue occupation of it as part of the reservation." *Tucker*, 237 Wis. at 315–16.

Shortly after *Tucker* was decided, however, a federal district court judge in *Ex Parte Konaha*, 43 F. Supp 747 (E.D. Wis. 1942), questioned the soundness of the *Tucker* decision. *Konaha* arose from the arrest and prosecution of an enrolled Menominee Indian on a charge of negligent homicide stemming from an incident which occurred on Highway 47 within the boundaries of the Menominee Reservation. In granting a writ of habeas corpus brought by Konaha, the court held that the state did not have jurisdiction over the offense. The court reasoned that Indian title was equivalent to beneficial ownership which continued even when the United States granted an easement for construction and maintenance of a highway on tribal lands. Therefore, the Menominee Indians' title to the land underlying the roadway was not, as *Tucker* held, extinguished by the granting of the right-of-way. The court also noted that Congress had not granted express authority for the state to exercise jurisdiction over the offense involved in *Konaha*.

*Ex Parte Konaha* was affirmed by the Seventh Circuit Court of Appeals in *Application of Konaha*, 131 F.2d 737 (7th Cir. 1942). Although it upheld the result of *Ex Parte Konaha*, the court distinguished *Tucker* on its facts in that *Konaha* involved a felony offense, while *Tucker* involved merely the failure to register a vehicle. The court noted that the federal government had traditionally exercised exclusive jurisdiction of Indian punishment for violations of criminal statutes occurring between tribal members on reservations. Thus, the court reasoned, the grant of the right-of-way did not by implication carry

with it jurisdiction over criminal offenses. The court declined to consider the question posed by *Tucker;* namely, did the right-of-way carry with it an implied grant of state jurisdiction to permit adequate regulatory protection of the highway?

In *In Re Fredenberg,* 65 F. Supp. 4 (E.D. Wis. 1946), the same federal court again dealt with the question of state jurisdiction over Highway 47 within the Menominee Reservation. The facts of *Fredenberg* closely paralleled those of *Tucker:* Fredenberg, an enrolled Menominee Indian, was arrested on Highway 47 within the Menominee Reservation and charged and convicted for failure to register his motor vehicle with the state. The district court, in granting Fredenberg's petition for a writ of habeas corpus, reiterated its belief that *Tucker* was an unsound decision. The court concluded the establishment of Highway 47 did not alter the relationship between the Menominees and the state. The easement granted for the highway was limited in character, and the state accepted it on that limited basis. Based on this reasoning, the court again held that the granting of the Highway 47 right-of-way neither extinguished Indian title nor carried with it by implication jurisdiction for the state to enforce its registration statutes.[4]

---

[4] In its memorandum decision, the trial court concluded that, because the State of Wisconsin had not appealed the *Fredenberg* decision, its holding had been accepted by the state as the law on this area. We would note that this court is bound on the subject of federal law only by the pronouncements of the United States Supreme Court. *See Stuart v. Farmers Bank of Cuba City,* 137 Wis. 66, 75, 117 N.W. 820 (1908); *United States ex rel. Lawrence v. Woods,* 432 F.2d 1072, 1075–76 (7th Cir. 1970). Therefore, the *Konaha* and *Fredenberg* decisions do not in themselves stand as a precedential bar to this court following the *Tucker* decision. For its part, the state still relies on the continued vitality of the *Tucker* decision. *See, e.g.,* 66 Op. Att'y. Gen. 116, 122 (1977).

We conclude, based upon our reading of the Treaty of Wolf River, *supra,* that the United States granted the Menominee Tribe "treaty-recognized" title to all lands, including the land underlying Highway 47, encompassed by the Menominee Reservation.[5] Such title cannot be abrogated absent an explicit statement by Congress or clear congressional intent shown by the circumstances and legislative history surrounding a congressional act. *Mattz v. Arnett,* 412 U.S. 481, 505 (1973).

It is clear that 25 U.S.C. sec. 311 does not contain an explicit extinguishment of Indian property rights.[6]

---

[5] There are two types of title which Indians possess over their lands. The first, characterized as "aboriginal" or "Indian" title, derives from actual, exclusive, and continuous occupancy for a long time. *Strong v. United States,* 518 F.2d 556, 560, 207 Ct. Cl. 254 (1975); *Sac and Fox Tribe of Indians of Oklahoma v. United States,* 315 F.2d 896, 903, 161 Ct. Cl. 189 (1963), *cert. denied,* 375 U.S. 921. The United States can, however, extinguish aboriginal title at any time and by any means. Essentially, aboriginal title was good against all but the United States, *see Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 288–89 (1955), and only the United States could extinguish that title, *Oneida Indian Nation v. County of Oneida, N.Y.,* 414 U.S. 661, 668–70 (1974).

The second kind of Indian title to lands, characterized as "recognized" or "treaty" title, derives from an acknowledgment by the United States that the Indians have a legal right permanently to occupy and use a certain tract. *United States v. Bouchard,* 464 F. Supp. 1316, 1347 (W.D. Wis. 1978). This type of title constitutes a legal interest in the land which can only be extinguished upon payment of compensation. *See United States v. Sioux Nation of Indians,* 448 U.S. 371, 415 n. 29 (1980). The Supreme Court has made clear that abrogation of treaty-recognized title requires an explicit statement by Congress or, at least, intent that is clear from the circumstances and legislative history surrounding a congressional act. *Lac Courte Oreilles Band, Etc. v. Voigt,* 700 F.2d 341, 352 (7th Cir. 1983), citing *Mattz v. Arnett,* 412 U.S. 481, 505 (1973).

[6] An example of the requisite congressional intent can be found in *Clairmont v. United States,* 225 U.S. 551 (1912). In *Clairmont*

Keeping in mind that ambiguities in statutes are resolved in favor of the Indians, *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 354 (1941), we also find that 25 U.S.C. sec. 311 does not evince congressional intent to extinguish property rights upon the grant of a right-of-way to the state. The statute merely authorizes the Secretary of the Interior to "grant permission . . . for the opening and establishment of public highways . . . through any Indian reservation." We do not find any language in this statute which would lead us to conclude that the grant of a highway right-of-way was intended to extinguish Indian property rights to that land.[7]

If there was any confusion as to the status of rights-of-way through Indian reservations, it was cleared up by Congress in 1948 by the enactment of 18 U.S.C. sec. 1151. Section 1151(a) of 18 U.S.C. contains in its definition of Indian country "all land within the limits of any In-

---

the issue was whether Congress had intended to extinguish Indian title by the grant of a railroad right-of-way through the Flathead Reservation in Montana. In holding that Congress did intend to extinguish the Indians' property rights, the Court relied on language in the act that the United States should " 'extinguish, as rapidly as may be consistent with public policy and the welfare of the said Indians, the Indian titles to all lands falling under the operation of this act.' " *Id.* at 555–56. Clearly, 25 U.S.C. sec. 311 does not contain language of this explicit nature.

[7] *United States v. Truckee-Carson Irrigation District*, 649 F.2d 1286 (9th Cir. 1981), is an analogous case. *Truckee-Carson* involved the issue of whether Congress had authorized the Secretary of the Interior to extinguish Indian reservation water rights through land reclamation. Under the Reclamation Act of 1902, the Secretary was given broad condemnation powers to acquire property for water reclamation projects. The act, as with 25 U.S.C. sec. 311, was silent on the issue of Indian property rights. The *Truckee-Carson* court rejected the defendants' assertion that the act conferred upon the Secretary authority to extinguish Indian water rights because the act did not contain explicit language to that effect. *See Truckee-Carson*, 649 F.2d at 1298–99.

dian reservation under the jurisdiction of the United States Government . . . *including rights-of-way running through the reservation.*" (Emphasis added.) Although this statute appears in the federal criminal code section governing federal criminal laws applicable on Indian reservations, the Supreme Court in *DeCoteau v. District County Court,* 420 U.S. 425, 427 n. 2 (1975), recognized that the statute's definition generally applies also to questions of federal civil jurisdiction and to tribal jurisdiction.

Several cases interpreting the definition of Indian country in sec. 1151 have concluded that a right-of-way through an Indian reservation does not amount to a jurisdictional grant to the state.[8] This court recently stated that, for purposes of treaty-guaranteed hunting and fishing rights, a right-of-way within a reservation is no different from other reservation land. *State v. Lemieux,* 110 Wis. 2d 158, 165, 327 N.W.2d 669 (1983). We conclude that the language of 25 U.S.C. sec. 311, taken together with the expressed congressional intent to include rights-of-way as part of Indian country, implies that the granting of the Highway 47 right-of-way pursuant to sec. 311 neither extinguished title in the Menominee Tribe nor constituted a general grant of jurisdiction

---

[8] *See United States v. Harvey,* 701 F.2d 800, 805 (9th Cir. 1983) (25 U.S.C. sec. 311 is not a general grant of jurisdiction to the states over the land constituting the right-of-way) ; *Ortiz-Barraza v. United States,* 512 F.2d 1176, 1180 (9th Cir. 1975) (rights-of-way running through a reservation remain part of the reservation and within the territorial jurisdiction of the tribal police). *See also Enriquez v. Superior Court, in and for County of Pima,* 115 Ariz. 342, 565 P.2d 522 (Ct. App. 1977) ; *Application of Denetclaw,* 83 Ariz. 299, 320 P.2d 697 (1958) ; *Sigana v. Bailey,* 282 Minn. 367, 164 N.W.2d 886 (1969) ; *Schantz v. White Lightning,* 231 N.W.2d 812 (N.D. 1975) ; *Gourneau v. Smith,* 207 N.W.2d 256 (N.D. 1973). *Cf. State v. Dugan,* 52 N.C. App. 136, 277 S.E.2d 842 (1981).

to the state over the land constituting the right-of-way. Anything in *State v. Tucker, supra,* contrary to our holding in this case is hereby overruled.

The state argues that, even if title was not transferred when the Highway 47 right-of-way was originally granted, the Termination Plan [*see* 26 Fed. Reg. 3726 (1961)] effectuated a transfer of title of the right-of-way to the state and, therefore, did not transfer the land encompassed by the right-of-way to the tribal corporation. Therefore, when the Menominee Reservation was reestablished pursuant to the Restoration Act, the reservation land transferred back to the United States from the tribal corporation could not have included the right-of-way. Consequently, the state argues, the right-of-way is no longer part of the reservation, and the state has general jurisdiction over all persons using the subject road.

We reject the state's argument. Following the lead of the United States Supreme Court, we do not readily conclude that an Indian reservation has been terminated.

" '[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress.' *United States v. Celestine,* 215 U.S. 278, 285. The congressional intent must be clear, to overcome 'the general rule that "[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." ' *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, quoting *Carpenter v. Shaw,* 280 U.S. 363, 367." *De Coteau v. District County Court,* 420 U.S. at 444.

The Termination Plan only mentions the disposition of roads in passing. There is no explicit language which would support the state's argument that the plan was intended permanently to remove the roads from the Reservation. We view the plan's terms as merely an admin-

istrative transfer of the roads to comply with the Termination Act's purpose to terminate federal supervision over the Menominee Tribe and Reservation.

It was pointed out at oral argument that the federal government transferred title of the roads either to the state, the county, or the town of Menominee by quit claim deeds, thereby conveying to these governmental units only the interest the United States had at the time. This land was held by the United States in trust for the Menominees. Therefore, the Menominee's property interest in the land could not have been extinguished absent the explicit consent of Congress or clear intent shown by the enactment of the Menominee Termination Act. *See DeCoteau,* 420 U.S. at 444; *Mattz v. Arnett,* 412 U.S. at 505. We find neither an explicit congressional statement nor evidence of congressional intent to extinguish through the Termination Plan the Menominee's property interest in the right-of-way.

Any doubts as to the effect of the Termination Plan are resolved by the provisions of the Restoration Act reinstating any rights and privileges which might have been diminished or lost pursuant to the Termination Act. Thus, even assuming that the transfer of roads under the Termination Plan somehow removed the underlying land from the reservation, we conclude Congress intended to restore the Menominee's rights to that land when it enacted the Menominee Restoration Act.

Having decided that the title to the land underlying the Highway 47 right-of-way remains part of the Menominee Reservation, we now turn to the question whether the state nevertheless has the right to exercise jurisdiction over Highway 47 within the Menominee Reservation. We begin our analysis by exploring the analytical framework the United States Supreme Court has developed to determine whether states have jurisdiction over

Indian country. We note at the outset that the Supreme Court has rejected the view that the states are absolutely barred from exercising jurisdiction over tribal reservations and members. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 141 (1980). However, there remain two independent but related barriers to the state's exercise of jurisdiction. *Id.* at 142. First, the exercise of such authority may be preempted by federal law. *Id.*[9] Second, state jurisdiction may infringe upon the right of Indians to establish and maintain tribal self-government. *Id.* However, the trend of Supreme Court cases has been "away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption." *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 172 (1973). Nevertheless, tribal sovereignty still "provides a backdrop against which the applicable treaties and federal statutes must be read," *id.,* in preemption analysis.

The most recent Supreme Court case dealing with state jurisdiction over Indian reservations is *Rice v. Rehner,* 103 S. Ct. 3291 (1983). The issue involved in *Rice* was whether the State of California could regulate the sale of liquor by an Indian on an Indian reservation. The Court held that the state could require a federally licensed Indian trader on a reservation to obtain a state liquor license in order to sell liquor for off-premises consumption. In so holding, the Court first found that there was no tradition of tribal sovereign immunity or self-

[9] As noted in *Webster v. Department of Revenue,* 102 Wis. 2d 332, 333–34 nn. 3, 4, 306 N.W.2d 701 (Ct. App. 1981), federal preemption may result from either a specific treaty between the tribe and the federal government, *McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 172 (1973), or by pervasive federal regulation in a defined area which excludes state intervention, *Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 690 (1965).

governance in regards to liquor sales on the reservation. The Court also noted that the state had a strong interest in regulating the sale of liquor because such sales could have a substantial impact beyond the reservation boundaries. Thus, the Court concluded that it need not accord much weight to any asserted interest in tribal sovereignty. The Court next explored whether the state authority to license the sale of liquor was preempted by federal law. The Court concluded that there was no federal preemption, and in fact a federal statute specifically authorized such state regulation.

Although *Rice* is factually distinguishable from this case, its analytical framework is relevant to the question whether the State of Wisconsin may regulate Highway 47 within the Menominee Reservation. We interpret *Rice* as further shifting the emphasis away from tribal sovereignty toward federal preemption. Thus, the Court stated that, if "we do not find such a tradition [of tribal sovereignty], or if we determine that the balance of state, federal, and tribal interests so requires, our preemption analysis may accord less weight to the 'backdrop' of tribal sovereignty." *Rice,* 103 S. Ct. at 3295.

The *Rice* Court appears to have significantly modified the established rule that " '[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.' " *McClanahan,* 411 U.S. at 170–71. Thus, if the federal government was silent on an issue of state jurisdiction, it was presumed that the federal government retained jurisdiction either in itself or in the tribal government. The *Rice* Court, however, stated that the "presumption of [federal] preemption [of state jurisdiction] derives from the rule against construing legislation to repeal by implication some aspect of tribal self-government." *Rice,* 103 S. Ct. at 3299. Therefore, where there is no tradition of self-government, "it is not neces-

sary that Congress indicate expressly that the State has jurisdiction to regulate [the activity under question]." *Id.* at 3301–02. We read *Rice* as an indication that the Supreme Court is further opening the door to state regulation on Indian reservations. Even taking this into consideration, however, we conclude, after applying the *Rice* analysis, that the State of Wisconsin does not have jurisdiction to charge and prosecute the offenses involved in this case.

The first question under the *Rice* analysis is whether the Menominee Tribe has a tradition of tribal self-government in the area of traffic regulation on Highway 47 within the Menominee Reservation. We note that the Menominee exception to Public Law 280 was based upon a statement by the tribe "that its tribal police organization was capable of maintaining order on the reservation and that its people are not yet ready to be subjected to State laws." *See* S. Rep. No. 699, 83d Cong., 1st Sess. 7 (1953). Thus, even at the time the Menominees first submitted themselves to state jurisdiction (through the Menominee Termination Act), the tribe had an established tribal police system.

At oral argument both parties conceded that the Menominees currently exercise both civil and limited criminal jurisdiction over its members within the boundaries of the reservation. This jurisdiction is exercised pursuant to the Menominee Law and Order Code of the Menominee Tribe (MLOC). The MLOC contains provisions regarding traffic regulation which adopt by reference many traffic regulations contained in the Wisconsin statutes. These include at least two of the offenses charged here, namely, operating without a valid driver's license and operating while intoxicated. Further, the Menominees prosecute and impose penalties for offenses through their own tribal police department, court system, and jail (contracted with Shawano county). It was noted

at oral argument that Menominee tribal police patrol the roads on the Menominee Reservation but regulate only Indians. Based on these facts, we conclude that the Menominees have a well-established tradition of tribal self-government in the area of traffic regulation.

We next must evaluate the balance of state, federal, and tribal interests in the regulation of Highway 47. Clearly, the state has a strong interest in regulating the use of public roadways which it built and maintains. However, the Menominee tribe presumably also has a strong interest in regulating the use of roads within the reservation, not only for the safety of the general public, but also for the safety of tribal members. Thus, we view the state and the tribe as having equivalent general regulatory interests in traffic matters. As between the two interests, as they relate to regulating Menominee Indians' conduct on the reservation, however, we must tip the balance in favor of the tribe. We recognize that "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 144. We note that:

"The [Supreme] Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits. ' "The cases in this Court have consistently guarded the authority of Indian governments over their reservations." ' *United States v. Mazurie,* 419 U.S., at 558, quoting *Williams v. Lee, supra,* at 223." *Bracker,* 448 U.S. at 151.

We conclude that in this case there is a well-established system of tribal self-government, and there are strong

tribal regulatory interests. With this "backdrop" in mind, we next turn to the question whether the federal government has preempted state jurisdiction to regulate Highway 47 within the Menominee Reservation.

The enactment of Public Law 280, the Menominee Termination Act, and the amendment of 18 U.S.C. sec. 1162 striking the Menominee exception to the state's criminal jurisdiction evinced congressional intent that the state's criminal and civil jurisdiction apply to the Menominee Reservation, including the Highway 47 right-of-way. The state's general jurisdiction took effect in 1961 when title to the property within the Menominee Reservation passed from the United States to the Menominee tribal corporation.

The state's jurisdiction ended, however, when Congress passed the Menominee Restoration Act. That act specifically provided that "there are hereby reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to [the Menominee Termination Act]." 25 U.S.C. sec. 903a(b). The act further provided that nothing contained in it would "diminish any rights or privileges enjoyed by the tribe or its members now or prior to June 17, 1954, under Federal treaty, statute or otherwise." 25 U.S.C. sec. 903a(c). The purpose of the Restoration Act was to "repeal the act terminating supervision over the affairs of the Menominee Indian Tribe of Wisconsin, reinstate such supervision, . . . and provide for the reestablishment of tribal self-government." S. Rep. No. 93–604, 93d Cong., 1st Sess. 1 (1973).

We read the Menominee Restoration Act as restoring to the Menominee Tribe the rights and privileges it enjoyed as of June 17, 1954. At that time the Menominee Tribe was free of the general jurisdiction of the state to enforce its laws against Menominee tribal members with-

in the boundaries of their reservation, which, under the definition of Indian country, included rights-of-way. The state recognized this by retroceding its jurisdiction in 1976. *See* 66 Op. Att'y. Gen. 116, 118 (1977). Therefore, from March 1, 1976, onward, the state has had no explicit authorization from Congress to exercise general jurisdiction within the Menominee Reservation.

The federal government has granted the Indians jurisdiction over certain offenses. *See* 18 U.S.C. sec. 1152. We interpret this statutory provision as giving the Menominee Indians jurisdiction to regulate the offenses charged against the defendant. We note, however, that this jurisdiction is somewhat limited in that the penalties imposed cannot exceed a maximum six-month jail term or a maximum $500 fine. 25 U.S.C. sec. 1302(7) (1976). When we analyze the backdrop of tribal sovereignty, the intent behind the Menominee Restoration Act, and the grant of jurisdiction under 18 U.S.C. sec. 1152 to the Menominee Tribe, we can only conclude that a finding of state jurisdiction in this case would interfere with tribal self-government and "impair a right granted or reserved by federal law." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148 (1973). Accordingly, we hold that the State of Wisconsin does not have jurisdiction to charge and prosecute the traffic offenses allegedly committed by the defendant, an enrolled member of the Menominee Indian Tribe, on Highway 47 within the boundaries of the Menominee Reservation.

*By the Court.*—Order affirmed.

STEINMETZ, J. *(dissenting).* The majority opinion does not recite whether the tribal authorities license drivers operating on the reservation roads and highways or whether such drivers are required to possess a State of Wisconsin operator's license. Also left unanswered is if a

tribal driver's license is issued, is it valid on any highway other than those on the reservation?

If the driver's license of the tribal member, such as James A. Webster, is granted by the state as an operating privilege, then the balancing of the interest must be in favor of state enforcement. Unanswered is whether the tribal government can impose fines or penalties for a person's violation of state motor vehicle laws.

Certainly, the state has a strong interest in the safety of its highways to all persons using them and, therefore, applying the balancing test of *Rice v. Rehner,* 103 S. Ct. 3291 (1983), I would reverse the trial court. The impact of jurisdiction over motor vehicle rules and regulations and, in particular, the licensing provisions, have an impact beyond the reservation boundaries. Persons other than Menominee tribe members use Highway 47. Many nonenrolled tribal members use it as a regular means of travel. After this decision of the majority, the state should post signs on Highway 47 at the borders of the reservation warning users that Wisconsin motor vehicle laws do not apply to members of the Menominee tribe while on the highway within the reservation.

Argument was made in this case that confusion of authorities would prevail among the federal government, tribal government and the state if state rules and regulations were applied to Highway 47. This does not seem evident since applying state motor vehicle rules and regulations to Highway 47, a state highway, to all persons using it would eliminate, not cause confusion.

There is a claim that this majority decision applies only to the Menominee reservation and enrolled members of the Menominee nation; however, the same criteria if present could be inferred to apply to all reservations. They are:

(1) No direct federal pre-emption;

(2)  An established tribal government with its own set of rules and regulations which have been and are enforced; and

(3) No paramount state interest or a presumption against state regulation.

Balancing the interests as provided for in *Rice* tip in favor of applying Wisconsin motor vehicle laws to all users of a state highway such as Highway 47, especially as they apply to operating privileges.

I would reverse.