**UNITED STATES of America,**
**Plaintiff,**

v.

**Frank LONG, Defendant.**

**No. 01–CR–102.**

United States District Court,
E.D. Wisconsin.

Jan. 23, 2002.

Brian E. Pawlak, Racine, WI, for plaintiff.

Brian P. Mullins, Milwaukee, WI, for defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Defendant Frank Long, an American Indian, moves to dismiss a federal indictment on the ground that the prosecution of him by the United States violates the Double Jeopardy Clause because the Menominee Indian Tribe previously prosecuted and convicted him of the same offense. Magistrate Judge Patricia A. Gorence recommended that I deny the motion, and defendant objected to her recommendation. I review the portion of the recommendation to which defendant objected de novo. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 673–676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).[1]

## I. FACTUAL BACKGROUND

The relevant facts are not in dispute. On April 23, 2001, defendant, a 19 year old enrolled member of the Menominee Tribe, was charged in Menominee Tribal Court with stealing a truck owned by Edward J. Reiter on March 23, 2001. On May 15, 2001, a federal grand jury indicted him for the same theft, charging that on March 23, 2001, he took and carried away a blue Ford F150 pickup truck owned by Edward

Reiter, an American Indian, in violation of 18 U.S.C. § 661 and 1153(a). On July 23, 2001, defendant pleaded no contest to the theft charge in tribal court and was sentenced to 120 days in the tribal jail.[2] Defendant subsequently appeared before a magistrate judge on the federal charge and moved to dismiss on double jeopardy grounds.

The unique history of the Menominee Tribe is also relevant to this case. Prior to the arrivals of Europeans, the Menominee people had a system for handling disputes that centered around a Peacemaker, generally a respected elder recognized for great wisdom. Hon. Stephen M. Tourtillott–Grochowski, *Profile, Menominee Tribal Court, in On Common Ground: A Meeting of State, Federal and Tribal Courts* § 2 (Mar. 11–12 1999). After the establishment of the United States, the Tribe was granted a reservation in Wisconsin by the Treaty of Wolf River in 1854. *State v. Webster*, 114 Wis.2d 418, 421, 338 N.W.2d 474 (1983) (citing 10 Stat. 1064 (1854)). In the late 1800s the Bureau of Indian Affairs established a Court of Indian Offenses on the Menominee Reservation. This court was staffed by tribal judges appointed by the Bureau who operated under regulations promulgated by the Bureau and codified in the Code of Federal Regulations, 25 C.F.R. part 11. Tourtillott–Grochowski, *supra.*

For nearly a century, the Tribe was sovereign within its reservation trust

---

1. Defendant alternatively asked the magistrate judge to abstain from exercising jurisdiction. The magistrate judge recommended that this request be denied, and defendant did not object to this portion of the recommendation. If no objection or only a partial objection is made, the district court reviews those unobjected to portions of the recommendation for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir.1999). The clear error standard is met only if I am "left with the definite and firm conviction that a

mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir.1997). Finding no clear error in the magistrate's recommendation that I deny defendant's motion to abstain, I will adopt that portion of the recommendation.

2. Defendant also pleaded guilty to malicious mischief for having driven the truck into a tree and received a concurrent 120 day sentence on that count.

lands, with the power to enforce its criminal laws against Tribe members through its courts. *See generally* Felix S. Cohen, *Handbook of Federal Indian Law* 231–35 (1982) (tribes began their relationship with the federal government with the sovereign powers of independent nations; upon coming under the authority of the United States, certain limitations on external powers followed, but the United States permitted then protected the tribes in their continued internal government).

On June 17, 1954, Congress enacted the Menominee Termination Act. *Webster*, 114 Wis.2d at 422, 338 N.W.2d 474 (citing Pub.L. No. 399, 68 Stat. 250 (1954)). "The purpose of the Termination Act was 'to provide for orderly termination of Federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin.'" *Id.* (quoting 68 Stat. at 250). On August 24, 1954, the same Congress also enacted Public Law 280, 18 U.S.C. § 1162, which transferred criminal jurisdiction over members of the Menominee Tribe from the federal government to the State of Wisconsin.[3] *See Latender v. Israel*, 584 F.2d 817, 819 (7th Cir.1978). The result of these two laws was to terminate tribal sovereignty and to place Menominee tribal members accused of criminal conduct in the same position as other residents of the State of Wisconsin.[4] *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 409, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Application of Nacotee*, 389 F.Supp. 784, 785 (E.D.Wis.1975); *see also* Cohen, *supra*, at 175 ("The result [of termination] was that all criminal and civil cases were handled by state courts, and federal and tribal law were no longer

applicable.... Another important practical effect of termination was to remove the sovereignty of terminated tribes.").

On December 22, 1973 Congress repealed the Termination Act by enacting the Menominee Restoration Act, 25 U.S.C. §§ 903–903f. The Act reinstated all "rights and privileges of the tribe or its members under Federal treaty, statute or otherwise which may have been diminished or lost pursuant to" the Termination Act. 25 U.S.C. § 903a(b). It further stated: "Nothing contained in this subchapter shall diminish any rights or privileges enjoyed by the tribe or its members now or prior to June 17, 1954, under Federal treaty, statute, or otherwise, which are not inconsistent with the provisions of this subchapter." 25 U.S.C. § 903a(c).

On March 1, 1976, the State of Wisconsin retroceded its criminal jurisdiction over the Menominee Reservation to the United States. *Webster*, 114 Wis.2d at 424, 338 N.W.2d 474. Thereafter, jurisdiction over crimes committed by Menominee Indians on the reservation (again) vested in federal and tribal governments. *State v. LaTender*, 86 Wis.2d 410, 431, 273 N.W.2d 260 (1979).

A Court of Indian Offenses was then re-established on the Reservation and functioned until 1979, at which time the Menominee Tribe established its own court system known as the Menominee Tribal Court. Tourtillott–Grochowski, *supra*. This is the court that convicted defendant.

## II. DISCUSSION

■■■ The Double Jeopardy Clause of the Fifth Amendment provides that the

---

**3.** Legal matters involving tribal members were then dealt with in the Shawano/Menominee County Courts. Tourtillott–Grochowski, *supra*.

**4.** In *Menominee Tribe v. United States*, 391 U.S. 404, 411, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the Court indicated that Public Law 280 must be considered "in pari materia with the Termination Act."

government shall not put a person in jeopardy of life or limb twice "for the same offence." U.S. Const. amend. V. The clause affords a defendant three basic protections: (1) protection against successive prosecution for the same offense after acquittal; (2) protection against successive prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). When a defendant is successively prosecuted under two different statutes, the test for determining whether the prosecutions involve the same offense is whether each statute requires proof of a fact which the other does not. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

■ Defendant argues that the United States is prosecuting him for the same offense that he was previously convicted of in the Menominee Tribal Court. The United States does not dispute that the tribal law under which defendant was convicted and the federal statute under which he is charged require proof of the same facts but argues that its prosecution of defendant is not barred because the Tribe and the United States are separate sovereigns. The Double Jeopardy Clause does not prohibit multiple prosecutions for the same conduct "when they are carried out by separate sovereigns." *See United States v. Enas*, 255 F.3d 662, 665–66 (9th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 925, —— L.Ed.2d —— (2002).

The question therefore is whether for double jeopardy purposes the Menominee Tribe is a separate sovereign from the United States. The Supreme Court addressed a similar question in *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), where the United States prosecuted an Indian who had previously been prosecuted for the same conduct by the Navajo Tribe. The *Wheeler* Court first reaffirmed the "well-established principle that a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one. The basis for this doctrine is that prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.'" *Id.* at 316, 98 S.Ct. 1079. This is so because each sovereign is able to define an "offence" according to its own laws. Therefore, the same act may be an "offence" under the laws of either, and an offender punished by both has not been punished twice for the same offence; rather, he has committed two offences. *Id.* at 317, 98 S.Ct. 1079 (citing *Moore v. Illinois*, 14 How. 13, 19–20, 14 L.Ed. 306).

However, the Court noted that the so-called dual sovereignty concept does not apply where successive cases are brought by nominally different prosecuting entities. *Id.* at 318, 98 S.Ct. 1079. For example, a soldier who had been acquitted of murder by a federal court-martial could not be retried for the same offense by a territorial court in the Philippines, *id.* at 318, 98 S.Ct. 1079, because a territorial government is a creation of Congress "and its judicial tribunals exert all their powers by authority of the United States." *Grafton v. United States*, 206 U.S. 333, 354, 27 S.Ct. 749, 51 L.Ed. 1084 (1907). "When a territorial government enacts and enforces criminal laws to govern its inhabitants, it is not acting as an independent political community like a State, but as 'an agency of the federal government.'" *Wheeler*, 435 U.S. at 321, 98 S.Ct. 1079 (quoting *Domenech v. Nat'l City Bank*, 294 U.S. 199, 204–05, 55 S.Ct. 366, 79 L.Ed. 857 (1935)). Therefore, "successive prosecutions by fed-

eral and territorial courts are impermissible because such courts are 'creations emanating from the same sovereignty.'" *Id.* at 318, 98 S.Ct. 1079 (quoting *Puerto Rico v. Shell Co.*, 302 U.S. 253, 264–66, 58 S.Ct. 167, 82 L.Ed. 235 (1937)). Similarly, successive prosecutions by a city and the state of which it is a political subdivision for the same unlawful conduct violate the Double Jeopardy Clause, notwithstanding that state law treated them as separate sovereigns. *Id.* at 318–19, 98 S.Ct. 1079 (citing *Waller v. Florida*, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970)).

The defendant in *Wheeler* argued that because Indian tribes derive their power to punish crimes from the federal government and because Congress has plenary authority over tribes, the concept of dual sovereignty should not be invoked to authorize successive prosecutions by a tribe and the federal government. *Id.* at 319, 98 S.Ct. 1079. The Court rejected the argument, focusing not on the federal government's power over Indian tribes but rather on the source of the tribes' sovereignty. *Id.* at 320, 98 S.Ct. 1079. Unlike cities, which are creations of states, and territories, which are creations of Congress, *id.* at 320–21, 98 S.Ct. 1079, the Court noted: "The powers of Indian tribes are, in general, *'inherent powers of a limited sovereignty which has never been extinguished.'*" *Id.* at 322, 98 S.Ct. 1079 (quoting Felix S. Cohen, *Handbook of Federal Indian Law* 122 (1945) (emphasis in original)).

The Court acknowledged that since their incorporation within the territory of the United States Indian tribes no longer possessed the full attributes of sovereignty. But the tribes had not given up their full sovereignty. *Id.* at 323, 98 S.Ct. 1079.

> The sovereignty that all Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete de-

feasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

> It is evident that the sovereign power to punish tribal offenders has never been given up by the Navajo Tribe and that tribal exercise of that power today is therefore the continued exercise of retained tribal sovereignty. Although both of the treaties executed by the tribe with the United States provided for punishment by the United States of Navajos who commit crimes against non-Indians, nothing in either of them deprived the tribe of its *own* jurisdiction to charge, try, and punish members of the tribe for violation of tribal law.

*Id.* at 323–34, 98 S.Ct. 1079.

The Court further noted that Congress had repeatedly recognized that Indian tribes had the power to punish their own members for violations of tribal law and had declined to disturb that power. *Id.* at 325, 98 S.Ct. 1079. Moreover, the sovereign power of the tribes to prosecute their members for tribal offenses was not lost by virtue of their dependent status. *Id.* at 326, 98 S.Ct. 1079.

Finally, the Court said: "That the Navajo Tribe's power to punish offenses against tribal law committed by its members is an aspect of its retained sovereignty is further supported by the absence of any federal grant of such power. If Navajo self-government were merely the exercise of delegated federal sovereignty, such delegation should logically appear somewhere." *Id.* at 326–27, 98 S.Ct. 1079.

In sum, the power to punish offenses against tribal law committed by tribe members, which was part of the Navajos' primeval sovereignty, has never

been taken away from them, either explicitly or implicitly, and is attributable in no way to any delegation to them of federal authority. It follows that when the Navajo Tribe exercises this power, it does so as part of its retained sovereignty and not as an arm of the Federal Government. *Id.* at 328, 98 S.Ct. 1079 (footnote omitted). The Court thus held that because "tribal and federal prosecutions are brought by separate sovereigns, they are not 'for the same offence,' and the double jeopardy clause thus does not bar one when the other has occurred." *Id.* at 329–30, 98 S.Ct. 1079.

In a footnote, the Court expressed the following caveat: "By emphasizing that the Navajo Tribe never lost its sovereign power to try tribal criminals, we do not mean to imply that a tribe which was deprived of that right by statute or treaty and then regained it by an Act of Congress would necessarily be an arm of the Federal Government. That interesting question is not before us, and we express no opinion thereon." *Id.* at 328 n. 28, 98 S.Ct. 1079.

In the two decades since *Wheeler* was decided the Court has not had occasion to answer this interesting question. And, while a few lower federal courts have grappled with related issues, none has addressed it either. Nevertheless, a brief discussion of the lower court cases is helpful.

In *United States v. Enas*, 255 F.3d 662, 664 (9th Cir.2001) (en banc), *cert. denied*, —— U.S. ——, 122 S.Ct. 925 (2002), the issue was whether, consistent with the Double Jeopardy Clause, an Indian tribe and the federal government could both prosecute a nonmember Indian for the same conduct. The factor that distinguished the case from *Wheeler* was the tribal identity of the defendant. In *Wheeler*, the defendant was a member of the tribe that had prosecuted him. Michael Enas, however, was an enrolled member of the San Carlos Apache Tribe when he allegedly stabbed Joseph Kessay, an enrolled member of the White Mountain Apache Tribe, on reservation land governed by the White Mountain Apaches. *Id.* at 665. Enas was charged in White Mountain Apache Tribal Court with assault with a deadly weapon and assault with intent to cause serious bodily injury. He pled guilty and was sentenced to 180 days in jail. *Id.* at 665.

When a federal grand jury indicted him for assault arising out of the same incident, Enas moved to dismiss the indictment on double jeopardy grounds, claiming that the Tribe and the United States were arms of the same sovereign for purposes of the prosecution. Enas argued that his case was not governed by *Wheeler* because the Tribe's authority to punish him, a nonmember, was not inherent but rather derived from Congress. This was so, he argued, because in *Duro v. Reina*, 495 U.S. 676, 688, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), the Supreme Court had held that tribes lack the inherent authority to try nonmembers in tribal courts, and Congress had promptly "overruled" the Court by amending the Indian Civil Rights Act (ICRA) by adding to the definition of tribal "powers of self-government" "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." *Enas*, 255 F.3d at 669. Enas contended that by conferring on tribes the authority to prosecute nonmember Indians Congress had made tribes and the federal government arms of the same sovereign for double jeopardy purposes.

Although the reasoning of the majority and concurring judges differed, the court unanimously held that the authority exercised by the Tribe was inherent rather

than delegated, and that the federal prosecution could go forward. The seven member majority said that "the critical question ... is whether Congress had the power to enact its vision of tribal sovereignty, one that was at odds with the Supreme Court's historical narrative." *Id.* at 670. The majority then undertook to determine whether the Tribe's status was an issue of constitutional, statutory, or federal common law, stating that in the first category the courts have the last word, but that in the latter two, Congress was the ultimate authority. *Id.* at 673–74. Concluding that the issue was one of federal common law, the majority held that Congress could state, as it had done in the amendments to the ICRA, that tribal jurisdiction over nonmembers was inherent. *Id.* at 675; *accord United States v. Archambault,* 174 F.Supp.2d 1009, 1016–17 (D.S.D.2001) (finding that because Congress could recognize the inherent power of a tribe to try nonmember Indians double jeopardy was not violated by a subsequent federal prosecution).

The four concurring judges also concluded that the Tribe's power to prosecute *Enas* was inherent but did not believe that they needed to assess the relative power of Congress and the Supreme Court in order to reach that decision. Rather, they said that tribes lacked authority to try nonmembers in their criminal courts until Congress enacted the 1990 amendments, exercising "its plenary power under the Indian Commerce Clause to restore prospectively the inherent authority of Indian tribes 'over all Indians,' including nonmembers." *Enas,* 255 F.3d at 679. However, "the fact that Congress enabled the tribes to exercise inherent sovereign power 'does not mean that Congress is the source of that power.'" *Id.* (quoting *Wheeler,* 435 U.S. at 328, 98 S.Ct. 1079). Rather, "tribal sovereignty is a vessel that Congress may fill or drain at its pleasure,

subject to certain constitutional limitations." *Id.* at 680. When *Duro* was decided, the tribes' sovereignty did not extend to prosecution of nonmember Indians, but then "Congress added to the vessel of tribal sovereignty by recognizing the tribes' inherent power to prosecute members of other tribes who commit crimes on the reservation." *Id.*

In *United States v. Weaselhead,* 156 F.3d 818 (8th Cir.1998), *rev'd en banc,* 165 F.3d 1209 (8th Cir.1999), a case factually similar to *Enas,* a majority of the panel reached a contrary decision, concluding that the "ascertainment of first principles regarding the position of Indian tribes within our constitutional structure of government is a matter ultimately entrusted to the Court and thus beyond the scope of Congress's authority to alter retroactively by legislative fiat." *Id.* at 824. Thus, although Congress could delegate additional prosecutorial authority to a tribe, it could not "declare existent a sovereignty-based jurisdiction that the Court has declared to be non-existent." *Id.* Therefore, a federal prosecution of a nonmember Indian previously tried in a tribal court for the same behavior was barred by the Double Jeopardy Clause. *Id.*

In dissent, Judge Morris Arnold wrote that "the question of what powers Indian tribes inherently possess ... has always been a matter of federal common law," *id.* at 825, in which Congress was supreme, and that therefore Congress could expand and contract the inherent sovereignty of the tribes. Thus, he concluded that the tribal court proceeded under inherent sovereignty, not under power delegated by Congress. *Id.*

However, the opinion of the panel in Weaselhead was withdrawn and vacated in favor of rehearing by the court en banc. The court then split, four to four, the

effect of which was to affirm the district court's order denying the motion to dismiss. The court produced no opinion, only a per curiam order. *United States v. Weaselhead,* 165 F.3d 1209 (8th Cir.), *cert. denied,* 528 U.S. 829, 120 S.Ct. 82, 145 L.Ed.2d 70 (1999).

In *United States v. Norquay,* 702 F.Supp. 228 (D.Minn.1989), *vacated and remanded on other grounds,* 905 F.2d 1157 (8th Cir.1990), the defendant claimed that a federal prosecution subsequent to his conviction in Red Lake Tribal Court for the same behavior violated the Double Jeopardy Clause. He claimed that under an 1866 agreement between the federal government and the Red Lake Tribe, the tribe surrendered its inherent sovereign authority to prosecute crimes. He argued that, under *Wheeler,* once surrendered, an Indian tribe cannot regain its sovereign status and independent sovereign authority to prosecute crimes, and that therefore the Red Lake Tribe's power to prosecute him was derived from the federal government. *Id.* at 229. However, the court found it unnecessary to decide the question concluding that the 1866 agreement was never adopted by Congress and had no legal effect. *Id.* at 230.

■ Thus, no lower court decision has addressed the question presented here— whether, when Congress reinstates sovereign power that it has previously extinguished, such power is properly characterized as inherent or delegated. As previously set forth, the Menominee Tribe was sovereign within its reservation from 1854 to 1954. In 1954 pursuant to the Termination Act and Public Law 280, Congress terminated its sovereignty and transferred criminal jurisdiction over tribal members to the State of Wisconsin. In 1973, dissatisfied with the experience under the Termination Act, Congress enacted the Menominee Resto-

ration Act reinstating the Tribe's rights and privileges. The State then gave up its criminal jurisdiction over the reservation, and jurisdiction again vested in the federal and tribal governments.

The question presented, therefore, is unique because the history of the Menominee Tribe is unique. The United States correctly asserts that the Restoration Act of 1973 restored the powers that the Tribe possessed before the Termination Act of 1954. This assertion, however, begs the question of whether the source of such powers is the Tribe's inherent sovereignty or a delegation from Congress. As the majority noted in *Enas,* "the line between inherent and delegated powers is a fuzzy one, and at times seems to collapse." *Enas,* 255 F.3d at 671. It is difficult enough, conceptually, to recognize as sovereign an entity whose authority, unlike that of other sovereignties such as states or countries, may be enhanced, diminished, altered, or even extinguished by an act of Congress. Nevertheless, the Supreme Court recognizes that tribes retain sovereign powers "until Congress acts." *Wheeler,* 435 U.S. at 323, 98 S.Ct. 1079.

In the case of the Menominee Tribe Congress did act. In fact, Congress acted twice, first in 1954 by terminating the Tribe's sovereignty and, second in 1973 by reinstating it. To conclude in the face of these acts that the Tribe's power to prosecute defendant is inherent rather than delegated would be to collapse and render meaningless the distinction between inherent and delegated power, which is the linchpin of the *Wheeler* decision. When Congress passed the Restoration Act in 1973, it conferred power on a Tribe that had none. If this was not a delegation of power it is difficult to imagine what would be.

The *Wheeler* Court based its conclusion that the Navajo Tribe's prosecution of

Wheeler was an exercise of inherent sovereign power on several grounds. First, the Court said that while the Tribe's sovereignty existed only at the sufferance of Congress, the Tribe retained such power until Congress acted. *Wheeler*, 435 U.S. at 323–24, 98 S.Ct. 1079. In the present case, by passing the Termination Act Congress exercised its plenary power and withdrew the Menominee Tribe's sovereignty. Second, the Court said that Congress had repeatedly recognized the right of the tribes to punish their own members and declined to disturb that power. *Id.* at 325, 98 S.Ct. 1079. In the present case, Congress did disturb such power as the Termination Act constituted a complete "defeasance" of tribal sovereignty. *See id.* at 323, 98 S.Ct. 1079. Third, the Court noted that if the Navajo Tribe had acted pursuant to a delegation of federal power, "such delegation should logically appear somewhere." *Id.* at 327, 98 S.Ct. 1079. In the present case, the delegation of power appears in 25 U.S.C. § 903a, the Restoration Act.

Further, the language of both the Termination and Restoration Acts supports the conclusion that the latter constituted a delegation of power. The Termination Act did not suspend or modify the tribe's sovereign status but effected a "termination" of it. 25 U.S.C. § 891 (1954). And the Restoration Act, unlike the 1990 amendments to the ICRA, 25 U.S.C. § 1301(2), did not merely recognize inherent tribal power but "reinstated" power that Congress had previously extinguished. If Congress had intended the statute to operate as a recognition of inherent power, like the 1990 amendments to the ICRA, it would have said so.

Moreover, the legislative history of the Restoration Act supports the conclusion that the Act delegated power. "The legislation calls for the recasting and the recreation of tribal government and the reestablishment of tribal control." 119 Cong.Rec. H34301 (daily ed. Oct. 16, 1973) (statement of Rep. Meeds); *see also Latender*, 584 F.2d at 822 (quoting Sen.Rep. No. 93–604, 93rd Cong., 1st Sess. 6 (1973)) (according to the Senate Report, the Restoration Act was intended to "reinstate the tribe to all rights and privileges which were lost" by the Termination Act). Nowhere in the legislative history is there evidence of congressional intent to recognize inherent power.

Nothing in *Enas* suggests a different result. *Enas* involved a statute that unlike the Restoration Act expressly recognized inherent tribal power.[5] The *Enas* majority relied upon this specific statement of congressional intent, expressed pursuant to Congress's plenary authority over the tribes. Such a statement is conspicuously

---

**5.** I need not address the question of whether Congress could have declared in the Restoration Act that the power it was restoring was inherent. However, such an attempt would likely have stretched language and logic beyond the breaking point. First, the word inherent means, "Existing in someone or something as a *permanent* and inseparable element, quality, or attribute." *The Random House Dictionary of the English Language* 982 (2d ed.1987) (emphasis added). The Tribe's sovereignty as it currently exists obviously does not meet that definition; because it was terminated from 1954 to 1973 it does not stretch in a permanent and uninterrupted line from the days before Europeans arrived to the present. Second, when Congress repeals an act we do not erase all reference to that act. A reminder of the Menominee Termination Act remains in our statute books. United States Code Annotated, Title 25: Indians §§ 441 to 1030, p. 665–66. Finally, unlike Orwell's residents of Oceania, we do not accept the notion that something has always been so when we know it has not. *See* George Orwell, *Nineteen Eighty–Four* 181–82 (1949).

absent in this case. *Enas,* 255 F.3d at 673–75.

Further, the concurrence in *Enas* compared tribal authority to a vessel "that Congress may fill or drain at its pleasure, subject to certain constitutional limitations." *Id.* at 680 (Pregerson, J., concurring). Applying that metaphor to the present case, Congress did not fill or drain the vessel in passing the Termination Act but rather eliminated the vessel entirely. In passing the Restoration Act, Congress recreated the vessel. When it recreated the vessel, Congress delegated power to the Tribe.

Thus, while the Menominee Tribe is a separate sovereign, the source of its sovereignty is the Restoration Act of 1973. Therefore, the dual sovereignty doctrine does not apply in the present case because the Tribe and the United States are nominally different prosecuting entities whose authority stems from the same source. *Wheeler,* 435 U.S. at 318, 98 S.Ct. 1079 (citing *Grafton,* 206 U.S. at 354–55, 27 S.Ct. 749). The Menominee Tribe owes its current existence as a sovereign entity to the United States, and its courts exert power by authority of the United States. Therefore, because defendant was previously convicted in the Menominee Tribal Court of the theft with which he is presently charged, the present prosecution violates the Double Jeopardy Clause.

In reaching this conclusion I am mindful of the United States's concern about the potential problem of defendants committing serious offenses on the reservation and quickly pleading guilty in tribal court to avoid stiffer federal penalties. ICRA severely limits the sentences that may be imposed by tribal courts. 25 U.S.C.

§ 1302(7). *See also Wheeler,* 435 U.S. at 318, 98 S.Ct. 1079 (noting concern that prosecution by one sovereign for minor offense might bar prosecution by the other for much graver one, depriving the latter from effectively enforcing its laws).[6] The result the government fears, however, can be avoided by close communication between tribal and federal prosecutors regarding charging decisions.

■ I also note that successive prosecutions based on the same conduct (even if constitutional) are disfavored. *See Petite v. United States,* 361 U.S. 529, 530–31, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). The purpose of the *Petite* policy is to protect the individual "from any unfairness that is associated with successive prosecutions based on the same conduct." *Rinaldi v. United States,* 434 U.S. 22, 27, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977). Noting that the dual sovereignty doctrine has the potential for abuse, the Court has stated that "the greatest self-restraint is necessary when that federal system yields results with which a court is in little sympathy." *Bartkus v. Illinois,* 359 U.S. 121, 138, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *see also Fox v. Ohio,* 46 U.S. 410, 434, 5 How. 410, 12 L.Ed. 213 (1847) (individuals should be subjected to successive prosecutions only in "instances of peculiar enormity"). Indeed, "[r]esponding to the harshness of the dual sovereignty doctrine, over half of the states ... prohibit state prosecution following federal prosecution for the same offense based either on state statutes or state constitutional provisions." *People v. Morgan,* 785 P.2d 1294, 1296 (Colo.1990).

## III. CONCLUSION

For the reasons stated,

---

**6.** The present case does not present this situation as the offense involved is relatively minor. As the Ninth Circuit has noted, it is "rather surprising" that larceny is included in

the Major Crimes Act. *Wetsit v. Stafne,* 44 F.3d 823, 825 (9th Cir.1995) (also noting that for years federal prosecutions for theft on reservations were "virtually nonexistent").

**IT IS HEREBY ORDERED** that the magistrate judge's recommendation to deny defendant's motion to abstain from exercising jurisdiction is **ADOPTED,** and the motion is **DENIED;** the magistrate judge's recommendation to deny defendant's motion to dismiss based on double jeopardy is **REJECTED,** and the motion is **GRANTED;** and the indictment is **DISMISSED.**