**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Stephen TELLER, Defendant-Appellant.**

No. 84–1783.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1985.
Decided May 23, 1985.

Philip S. Beck, Chicago, Ill., for defendant-appellant.

Lawrence Anderson, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

Defendant Stephen Teller pled guilty to one count of assault resulting in serious bodily injury and was sentenced to incarceration for a term of ten years. After he had been sentenced, Teller moved to withdraw his guilty plea pursuant to Rule 32(d), FED.R.CRIM.P. The district court held an evidentiary hearing on the motion but denied relief. Teller now appeals the denial of relief, arguing that his guilty plea was not knowing, voluntary and intelligent, first because of the ineffectiveness of his counsel when informing him of the consequences of acquittal by reason of mental disease or defect, and second because it was entered while he was under the influence of drugs and alcohol. We affirm.

### I.

Teller was indicted on July 14, 1981, and charged with two counts of robbery within the Indian country in violation of 18 U.S.C. §§ 1153 & 2111. He originally pled not guilty but later changed this to not guilty by reason of mental disease or defect. A plea bargain was subsequently reached, and on July 30, 1982, Teller pled guilty to one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153 & 113(f).

At the plea hearing, the United States offered to prove that on the afternoon of July 3, 1981, Teller, an enrolled member of the Menominee Indian Tribe, was operating a green sedan proceeding in a northerly direction on Highway 55 near Keshena, Wisconsin on the Menominee Indian Reservation.[1] After pulling behind an automobile driven by Thomas Steidl, a non-Indian, in which Thomas Steidl's father Edward was a passenger, Teller repeatedly rammed his automobile into the rear of their vehicle. The Steidls stopped their vehicle by a wayside; Teller pulled behind them and stopped also. Teller then approached Thomas Steidl and forcibly pulled him from the automobile. Teller struck Thomas Steidl several times, first with his fists and then with a piece of wood, variously described as a club or a stick, which Teller got from his automobile. Teller then took the younger Steidl's wallet, which contained forty to fifty dollars, and his car keys, watch and credit cards.

At this point, Edward Steidl approached the driver's side of the vehicle in an attempt to aid his son. As the elder Steidl did so, Teller intentionally struck him over the head with his club. As a result of this blow, Mr. Steidl suffered a concussion and sustained a deep head wound which required numerous stitches. Teller then took a coin purse belonging to Edward Steidl and fled the scene.

---

**1.** The government's offer of proof is set out in the transcript of the original plea hearing, (the "Plea Tr.") at 9–12. The facts as here set out also rely on Teller's statements at the plea hearing. Plea Tr. at 15–16.

The district court accepted the guilty plea to the assault charge, and Teller was sentenced to ten years imprisonment. Teller filed a *pro se* notice of appeal at the same time his appointed counsel filed a motion to withdraw the guilty plea, pursuant to Rule 32(d), FED.R.CRIM.P., and another motion not here relevant. On direct appeal the conviction was affirmed in an unpublished order, *United States v. Teller*, 714 F.2d 150 (7th Cir.1983) (mem.), after which jurisdiction revested in the district court for consideration of the pending motions. The district court held an evidentiary hearing on the issues raised by the motions, and, on April 11, 1984, issued a Decision and Order denying the motions. *United States v. Teller*, No. 81–CR–110 (E.D.Wis. Apr. 11, 1984).

During Teller's original plea hearing, the district court noted that Teller was composed and articulate. Plea Tr. at 42, 44. This condition is apparently in contrast to Teller's behavior when under the influence of drugs or alcohol. *See* Plea Tr. at 26–27. Teller himself advised the court that he was controlling his alcohol problem. Plea Tr. at 21, 40. Teller's experienced trial counsel, who had had previous opportunities to observe him, stated that he had no qualms about the court's accepting Teller's guilty plea. Plea Tr. at 9.

At the evidentiary hearing on Teller's Rule 32(d) motion, held on March 9, 1984, Teller testified, as did his wife, his mother, his court-appointed trial counsel, Mr. Robert LeBell, and a Deputy U.S. Marshal. Teller testified that his attorney had withdrawn the not guilty by reason of insanity plea without his, Teller's, knowledge, and that LeBell advised him as follows:

> He says that he felt the jury wouldn't buy it, just 'cause I was messed up on drugs and alcohol that they wouldn't buy it, that I did the incident which I'm accused of; and he said if they did buy it, if they did go for it, I would more than likely spend the rest of my life in an insane asylum.

> Well, he said he thought the jury wouldn't buy the idea of an insanity plea because of drugs and alcohol. He said, "If they did," he says, "you would more than likely spend the rest of your life in an insane asylum."

Tr. at 10–11. Teller further testified:

> He [attorney LeBell] told me that that was life in an insane asylum, you know. He never mentioned that before. He never really explained nothing to me about the results of one of these hearings at all, and that's the first time he ever said anything about what kind of a sentence I'd get, and he said that I would get life, and I said, "No, no," I said, "I don't want to mess with no life."

Tr. at 22–23.

On the issue of intoxication, Teller testified that the night before the sentencing he was drinking a little bit and took about eight quaaludes. Tr. at 17. He said that the following morning his mother drove him to Keshena to meet the United States Marshal and that during this drive he took two more quaaludes. Tr. at 18. Teller testified that after he arrived in Milwaukee at about 11:00 or 11:30 a.m., he went to a bar where he had two shots of whiskey and took a third quaalude. Tr. at 20. Teller further testified that he then walked to his attorney's office and thereafter appeared at the sentencing. Teller acknowledged that he knew he was pleading guilty but claimed that "my mind wasn't in the right place, I know that, because I was—I had consumed like I say several quaaludes." Tr. at 23–24.

Attorney LeBell testified that two psychiatrists, Dr. Richard Gerhardstein and Dr. Frederick Fosdal, had examined Teller and that both had concluded that an insanity defense had no merit. Tr. at 33–35. LeBell said that Teller was also examined by a psychologist, Dr. Samuel Friedman, whom LeBell had used over 100 times. LeBell testified that although Friedman's report stated that Teller's condition was such as to render him incapable of forming intent, Friedman had advised him that "he had very little to back it up." Tr. at 35.

LeBell also testified that he believed the prosecutor "would have made in essence mincemeat of [Friedman] on the witness stand." Tr. at 35–36. Indeed, when questioned by LeBell, the three experts "all agreed that they would be significantly embarrassed by the government" if their testimony were introduced to negate intent. Tr. at 34.

In regard to his conversations with Teller on this subject, LeBell stated:

I indicated to Mr. Teller that we had three doctors. One doctor was technically supporting his position. The other two were adamantly against, or actually I shouldn't say adamantly. They were not going to support his position.

I also told him that I spoke to Doctor Friedman who I've used on probably 100 occasions, and I was convinced that in my experience this was the weakest NGI [not guilty by reason of insanity] defense I could ever propose to any of my clients.

Not only that, but that the intent defense was not going to fly either.

Tr. at 35.

On the question of exposure, attorney LeBell testified that:

I basically said he runs the exposure of being institutionalized in an asylum such as the term he uses or actually a mental health facility for a period not to exceed the maximum duration of the sentence should he actually be found guilty, that they could quite possibly extend it on a civil procedure, and that theoretically as a murder case somebody could spend the rest of their life in a hospital.

I thought that in his case and I advised him in his case, I didn't think that that was what was going to happen, that he would spend some time in a hospital and then be released.

Tr. at 36–37. LeBell also testified that:

I advised him of that on a number of occasions, I believe before we entered the [not guilty by reason of mental disease or defect] plea, after we entered the plea and once we had gotten reports back from various doctors.

Tr. at 37.

In explaining Teller's decision to plead guilty to the reduced charge, LeBell testified:

Mr. Teller and I had a number of long conversations on the phone. He was of the belief that the NGI, at least not guilty by reason of mental disease would prevail.

After talking to me, he recognized that it would not, and he ultimately decided to take the negotiations.

Tr. at 38. LeBell further testified that Teller reaffirmed his decision to plead guilty immediately prior to the hearing. LeBell stated that while he did not feel he talked Teller into changing his plea, he did advise him to "take the negotiation" because he felt it was in Teller's best interest. Tr. at 41.

In regard to Teller's intoxication claim, LeBell testified that on the day of the plea he was concerned about Teller being under the influence of alcohol. Tr. at 40. He further testified that in observing Teller that day, he did not detect anything which indicated to him that Teller was either intoxicated or under the influence of drugs. Tr. at 40, 45.

The deputy marshal who transported Teller from the Menominee Indian Reservation to Milwaukee on the day in question testified he neither smelled alcohol nor observed anything indicating that Teller was under the influence of narcotics. Tr. at 48. Teller's wife testified that the night before the plea hearing Teller had been drinking heavily, but she did not remember whether she saw him take any pills. Tr. at 51. Teller's mother, who drove him to meet the deputy marshall the morning of the plea hearing, testified that she saw him take some pills in the car. Tr. at 29.

## II.

Between the time Teller filed his motion and the date of the evidentiary hearing, the text of Rule 32(d) was changed. The Rule formerly provided:

A motion to withdraw a plea of guilty or of *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may be set aside the judgment of conviction and permit the defendant to withdraw his plea.

FED.R.CRIM.P. 32(d) (1982). Rule 32(d) was amended on April 28, 1983, by an order of the Supreme Court which provided that the new Rule 32(d) would take effect August 1, 1983, and would "govern all criminal proceedings thereafter commenced and, insofar as just and practicable, in proceedings then pending." The new rule provides for post-sentence withdrawal of a plea only pursuant to direct appeal or under the federal habeas statute, 28 U.S.C. § 2255.[2] Because "[s]ome courts ... have indicated that the rule 32(d) standard [of "manifest injustice"] provides a somewhat broader basis for relief than § 2255 [with its "miscarriage of justice" standard]," Notes of the Advisory Committee on Rules, the district court allowed the defendant to proceed under the provisions of former Rule 32(d), and applied its standard of manifest injustice. We believe, as apparently do both parties, that this was the proper approach. *See United States v. Kent,* 397 F.2d 446, 448 & n. 1 (7th Cir.1968) (treating § 2255 motion as Rule 32(d) motion was proper since the manifest injustice standard of Rule 32(d) provides the district court with greater leeway than does the standard of § 2255), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

■■■ Although the standards for granting a Rule 32(d) motion before sentencing are fairly liberal, such is not the case after sentencing. *United States v. Russell,* 686 F.2d 35, 38 (D.C.Cir.1982); *United States v. Berlin,* 437 F.2d 901, 905–06 (7th Cir.1971). Rather, a " 'near-presumption' against withdrawal [after sentencing is] imposed by the Rule." 8A J. MOORE, MOORE'S FED-

ERAL PRACTICE ¶ 32.07[2] at 32–129 (2d ed. 1984). The defendant who seeks to withdraw his plea of guilty after sentence bears the burden of proving the necessity of such action to correct manifest injustice. *Sherburne v. United States,* 433 F.2d 1350, 1353 (8th Cir.1970); *United States v. Mack,* 249 F.2d 421, 423 (7th Cir.1957). Resolution of this issue is within the sound discretion of the district court. *United States v. Russell,* 686 F.2d at 38; *Sherburne v. United States,* 433 F.2d at 1353; *United States v. Swaggerty,* 218 F.2d 875, 880 (7th Cir.), *cert. denied,* 349 U.S. 959, 75 S.Ct. 889, 99 L.Ed.2d 1282 (1955). A district court's denial of a post-sentence motion to withdraw a plea is to be reviewed solely for abuse of discretion in its conclusion that there was no manifest injustice which merited permitting withdrawal. *United States v. Lake,* 709 F.2d 43, 45 (11th Cir.1983); *United States v. Russell,* 686 F.2d at 38; *United States v. Berlin,* 437 F.2d at 906; *United States v. Mack,* 249 F.2d at 423.

### A.

■■■ Teller's first claim is that he was incapable of knowingly, voluntarily and intelligently pleading guilty because of his ingestion of quaaludes and liquor the night before and the day of his plea. A defendant is entitled to withdraw her guilty plea if she can prove that her mental faculties were so impaired by drugs or alcohol at the time of the plea that she was incapable of fully understanding the charges against her, comprehending her constitutional rights and realizing the consequences of her plea. *Sanders v. United States,* 373 U.S. 1, 5–6, 19–20, 83 S.Ct. 1068, 1071–1072, 1079–1080, 10 L.Ed.2d 148 (1963); *United States v. Malcolm,* 432 F.2d 809, 812 (2d Cir.1970). A trial judge's findings as to a defendant's mental competency at the time she pled guilty should be disturbed only if clearly erroneous. *United States v. Love-*

---

**2.** The new version of Rule 32(d) provides:

If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, imposition of sentence is suspended, or disposition is had under 18 U.S.C.

§ 4205(c), the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason. At any later time, a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255.

*lace,* 683 F.2d 248, 251 (7th Cir.1982) (lack of insulin); *Holmes v. United States,* 323 F.2d 430, 431 (7th Cir.1963) (ingestion of narcotics), *cert. denied,* 376 U.S. 933, 84 S.Ct. 704, 11 L.Ed.2d 652 (1964).

There was testimony that Teller had been drinking heavily and took eight quaaludes the evening before his plea hearing, and that he drank and took three more quaaludes the morning before the hearing. However, the district court found that Teller had failed to prove that his faculties were impaired so that he was incapable of comprehending the plea proceeding and its consequences.

■ The district court was convinced by evidence in the record that Teller had the mental capacity to understand the proceeding. Teller was able to negotiate around Milwaukee the morning before the hearing. Teller's attorney, who had talked with Teller when he was "obviously smashed" and who knew of Teller's problems with alcohol and drugs, did not notice any obvious signs of intoxication during the office interview just prior to the plea hearing. *See Holmes v. United States,* 323 F.2d at 431. The transcript of the plea hearing showed that the district court there found Teller to be composed and articulate during the hearing, and that Teller testified that he knew he was pleading guilty.[3] We believe the district court's finding that Teller was capable of understanding the nature and consequences of the plea is supported by the evidence and not clearly erroneous. Therefore it was not an abuse of discretion to deny Teller's motion as grounded on the claim that a conviction based on that plea was manifestly unjust due to his intoxication.

### B.

Teller's second claimed ground for withdrawing his plea is an assertion that he was misinformed by his trial counsel about the consequences of success on his prior plea of not guilty by reason of mental disease or defect. He claims that because of this misunderstanding of the possible consequences of his prior plea he was unable to knowingly, voluntarily and intelligently plead guilty.

■ The standard for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970); *see Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). "[I]t must be an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.'" *McMann v. Richardson,* 397 U.S. 759, 766, 90 S.Ct. 1441, 1446, 25 L.Ed.2d 763 (1970) (quoting *Brady v. United States,* 397 U.S. at 748, 90 S.Ct. at 1468). *See United States ex rel. Healey v. Cannon,* 553 F.2d 1052, 1056 (7th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 221, 54 L.Ed.2d 153 (1977). Where a defendant alleges that his guilty plea was not voluntary and intelligent because of erroneous advice of counsel, "he must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases.'" *Tollett v. Henderson,* 411 U.S. 258, 266, 93 S.Ct. 1602, 1607, 36 L.Ed.2d 235 (1973) (quoting *McMann v. Richardson,* 397 U.S. at 771, 90 S.Ct. at 1449). *See Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Clay v. Director, Juvenile Division, Dept. of Corrections,* 631 F.2d 516, 522 (7th Cir.1980); *Healey v. Cannon,* 553 F.2d at 1057. A "plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may

---

**3.** Teller argues that the regularity of the plea hearing and Teller's appearance during it are not conclusive to show that he was not under the influence of drugs or alcohol, citing *United States v. Malcolm,* 432 F.2d at 813. However, here, as in *Malcolm,* there was evidence on which the district court relied in addition to the transcript of the plea hearing. We also note that in *Malcolm* the conviction on a plea of guilty was affirmed even though the district court had denied collateral relief without a hearing on the intoxication issue. Here, in contrast, the district court conducted a full evidentiary hearing on Teller's claim.

have misjudged" and hence misstated one of the factors entering into a plea calculation. *McMann v. Richardson,* 397 U.S. at 770, 90 S.Ct. at 1448.

There is no dispute that Teller's attorney did misstate the consequences of success on the not guilty by reason of insanity plea. The attorney, whose testimony the district court found more credible than that of Teller on this point,

> testified that he told the defendant he *would* be confined in a mental institution for the maximum sentence allowable if convicted. He further told him that he could thereafter be subject to civil commitment proceedings, so that it was theoretically possible, although unlikely, that he could be confined for life.

Dist.Ct.Op. at 11 (emphasis added). This appears to be a fair synopsis of the attorney's testimony (though we might have concluded that he testified only that Teller would be confined for "some time" and then released), and we do not question the trial court's credibility determination.

The attorney was apparently describing the Wisconsin statutory provisions governing the consequences of successful insanity pleas. *See* WIS.STATS. § 971.17 (1983–84). Section 971.17 basically provides that a de-fendant found not guilty because of mental disease or defect shall be committed until it is shown that he can be safely discharged without danger to himself or others, or the maximum period for which he could have been imprisoned if convicted has passed, whichever is sooner. If the defendant is discharged upon expiration of the period of maximum possible imprisonment, the state may still commence civil commitment proceedings under chapter 51, WIS.STATS., possibly resulting in further commitment.

However, the Wisconsin section 971.17 procedures apply only after Wisconsin prosecutions. They do not apply after federal prosecutions. Prior to the recent revisions to the federal criminal code,[4] not applicable here, if a federal defendant was found not guilty by reason of insanity (except in the District of Columbia), he was released subject only to possible state-initiated civil commitment proceedings. *United States v. Greene,* 497 F.2d 1068, 1074 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). *See United States v. McCracken,* 488 F.2d 406, 415–25 (5th Cir.1974) (discussing federal statutes and procedures). Thus the attorney incorrectly stated that this state procedure would apply when in fact it did not.

---

**4.** Among the spate of revisions passed in the waning days of the Second Session of the Ninety-Eighth Congress was the "Insanity Defense Reform Act of 1984" (the "Act"), which is chapter IV of title II of the "Continuing Appropriations, 1985—Comprehensive Crime Control Act of 1984," Pub.L. 98–473, 98 Stat. 1837, 2057–68 (1984). Section 402 of the Act, 18 U.S.C. § 20, amends the federal insanity defense, and provides that it is an affirmative defense which the defendant bears the burden of proving by clear and convincing evidence. 98 Stat. 2057. Section 403, 18 U.S.C. § 4242(b), provides that if the defense is properly raised the verdicts available to the jury are guilty, not guilty and "not guilty only by reason of insanity." 98 Stat. 2059. If the jury returns the third verdict, the defendant "shall be committed to a suitable facility until such time as he is eligible for release" by proving that his "release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." § 403, 18 U.S.C. § 4243(a) & (e), 98 Stat. 2059. If the offense to which the defense was raised involved bodily injury to or damage to the property of another, or a substantial risk of such injury or damage, the burden is on the defendant to prove his lack of dangerousness by clear and convincing evidence. For other offenses he must prove this by a preponderance of the evidence. *Id.,* 18 U.S.C. § 4243(d). *See generally* S.REP. No. 225, 98th Cong., 2d Sess. 222–254, *reprinted in* U.S.CODE CONG. & AD.NEWS 3182, 3404 (Nov. 1984). Two district courts have indicated that these changes are subject to the *ex post facto* clause, a question not raised by this case and on which we express no opinion. *See United States v. Prickett,* 604 F.Supp. 407 (S.D. Ohio 1985); *United States v. Kowal,* 596 F.Supp. 375 (D.Conn.1984); *see also United States v. Williams,* 475 F.2d 355 (D.C.Cir.1973) (construing similar changes in D.C. statute). The Department of Justice accepts the view that these changes do not apply to conduct antedating the enactment of the statute. U.S. DEPT. OF JUSTICE, HANDBOOK ON THE COMPREHENSIVE CRIME CONTROL ACT OF 1984 AND OTHER CRIMINAL STATUTES ENACTED BY THE 98TH CONGRESS 58, 65 (1984). Thus we are not faced with a peculiar situation in which the attorney's advice was inaccurate when given but would be accurate if a trial were now held.

Further, by stating that Teller would be confined for the maximum term possible if he were to be convicted, he misdescribed both the inapplicable section 971.17 proceedings and the regular state civil commitment procedures of chapter 51, WIS.STATS. But he did correctly state a consequence of a successful insanity plea after either a federal or state trial—it is theoretically possible, though not likely, that a defendant could be confined in a mental institution for life.

We agree with the district court that this is a close case. The distinction between federal and state jurisdiction is among the most basic to our legal system, and even a reasonably competent first year law student must be aware of it. However, the intricacies of federal jurisdiction are among the most recondite and subtle with which lawyers must deal. Here, questions of jurisdiction are raised by two facts—the crime took place on an Indian reservation, and so trial was to be in federal court, and the defendant is an Indian, and so perhaps not subject to the state's civil commitment procedures. Indeed, the parties before us still do not agree as to which, if any, Wisconsin civil procedures would apply to Teller if he

were to prevail on an insanity defense. *Compare* Teller Br. at.9 n.* (no state involuntary civil commitment procedures apply to Menominee Tribe members residing on the Menominee reservation) *with* Gov't Br. at 14 n. 2 (§ 51.20 procedures "clearly applicable," though it is "open question" whether those of §§ 51.42 or 51.437 apply).[5]

■ However, we do not believe the district court erred in concluding that the advice given met the minimum standard of competence demanded of attorneys in criminal cases. The attorney correctly described the worst case, whichever procedure applied, if Teller went to trial—he might be confined for life. But the attorney's description of the best case was not as erroneous as Teller claims. The attorney correctly informed Teller that his was a weak case for the insanity defense—indeed the weakest of over one hundred he had considered—and not at all likely to succeed. Thus he concentrated on the overwhelmingly probable effect of going to trial—conviction. Given the evidence of the viciousness of Teller's crime, it would not have been wise to bet on receiving a lighter sentence

5. The existence and scope of Wisconsin's jurisdiction over Menominee Indians has been frequently litigated in this and other courts. *See, e.g., Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Latender v. Israel,* 584 F.2d 817 (7th Cir.1978), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1800, 60 L.Ed.2d 247 (1979); *State v. Webster,* 114 Wis.2d 418, 338 N.W.2d 474 (1983). It appears that all Indians in Wisconsin are subject to the state's civil jurisdiction, 28 U.S.C. § 1360, except for Menominees living on the Menominee reservation, 25 U.S.C. §§ 903 *et seq.,* 1323, and Proclamation of Gov. Lucey (February 19, 1976). *See* 41 Fed.Reg. 8516 (1976). *See also Latender v. Israel,* 584 F.2d at 818–23 (discussing parallel statutory provisions governing criminal jurisdiction); *State v. Webster,* 114 Wis.2d at 421–37, 338 N.W.2d at 476–83 (same). The Wisconsin Attorney General has opined that the state can neither institute involuntary civil commitment proceedings against Menominees nor accept custody of them pursuant to involuntary civil commitment orders issued by the Menominee Tribal Court, though it must provide such services for Menominees who voluntarily submit to them. 70 Op.Atty. Gen.Wisc. 219 (1981). *See also White v. Califa-*

*no,* 437 F.Supp. 543 (D.S.D.1977) (South Dakota cannot involuntarily commit Indian living on reservation nor accept such Indian for confinement pursuant to tribal court involuntary civil commitment order; federal Indian Health Service bears responsibility of providing services for Indian needing such treatment), *aff'd,* 581 F.2d 697 (8th Cir.1978). *Cf. Necklace v. Tribal Court of Three Affiliated Tribes,* 554 F.2d 845 (8th Cir.1977) (per curiam) (habeas proceedings available to Indian confined in state mental hospital under involuntary commitment order of tribal court allegedly in violation of due process). Thus it is an open question of some difficulty, which, fortunately, we need not decide, whether Teller could be involuntarily civilly committed at all. Nor do we know whether the Menominee Law and Order Code of the Menominee Tribe, by which the Menominees govern themselves, *see State v. Webster,* 114 Wis.2d at 434, 338 N.W.2d at 482, has provisions for involuntary civil commitment. Given the complexity of these issues, we do not see how it could be incompetence for an attorney to assume, in considering a plea bargain, that acquittal on an insanity defense could be followed by involuntary civil commitment.

on the two more serious charges than the one Teller actually received on the charge to which he pled.

 A defendant's choice is not between pleading and winning on a particular defense, but between pleading and going to trial. The expected value of going to trial is a function both of the magnitudes of the results of prevailing or not, and of the probabilities of prevailing or not.[6] Errors in describing the consequences of conviction on the original charges can require that a guilty plea to lesser charges be vacated. *Hammond v. United States*, 528 F.2d 15, 18–19 (4th Cir.1975) (plea based on erroneous advice that if he did not plead defendant could be sentenced to maximum 90–95 year sentence, when law allowed maximum of only 55 years, was involuntary); *Cooks v. United States*, 461 F.2d 530, 532 (5th Cir.1972) (vacating plea based on *"patently erroneous"* advice that if he did not plead defendant would be subject to sentence six times more severe than law actually allowed). Teller is correct that an error in describing the consequences of acquittal can vitiate a plea just as much as can an error in describing the consequences of conviction. This is one of those rare cases where the consequences of acquittal are not necessarily positive, and so a misdescription of those consequences could infect a defendant's "assess[ment of] the advantages and disadvantages of a trial as compared with those attending a plea of guilty," *Brady v. United States*, 397 U.S. at 754, 90 S.Ct. at 1472.

But Teller neglects to account for the probability of acquittal. In a case where the insanity defense has a fifty-fifty chance of succeeding, an error in describing the consequences of prevailing might drastically alter the defendant's calculation as to whether to go to trial. Here, however, the probability of acquittal—that is, of prevailing on the insanity defense—was small, as

Teller's attorney correctly advised him. Thus an error in describing the magnitude of the consequences of acquittal would not necessarily lead to a highly significant error in description and evaluation of the expected consequences of going to trial, which was Teller's alternative to pleading. Because his attorney correctly advised as to these consequences, and so Teller knew "the actual value of any commitments made to him," *Brady v. United States*, 397 U.S. at 755, 90 S.Ct. at 1472, we do not feel that here, on these facts, the attorney's advice fell below the minimum level of expected competence. *See Strickland v. Washington*, 104 S.Ct. at 2065–66 (counsel's assistance must be evaluated "in light of all the circumstances").

### C.

Because it believed this to be a close case, the district court considered two other factors in determining that there was no manifest injustice in letting Teller's plea stand. The first factor considered was that Teller never stated that if he had been correctly advised of the consequences of acquittal on his plea of not guilty by reason of insanity, he would not have pled guilty. Dist.Ct.Op. at 12–14. The district court reasoned that because the insanity defense was so likely to fail, inaccurate advice about the consequence of prevailing on it could not have been critical in Teller's decision to plead. This reasoning is not at all convincing. However, there is evidence in the record which can be interpreted to support the district court's conclusion.

At the original plea hearing the following colloquy took place between Teller and the court:

> The Court: ... I gather that you are doing it [pleading guilty to the reduced charge] because you think you are better off to plead guilty to an information that

---

**6.** We do not mean to imply that all defendants are or should be perfectly risk-neutral economic agents. The consequences of capital punishment may lead a defendant to plead to any lesser non-capital crime even if the expected value (or rather, "dis-value") of the plea is greater than that calculated for trial. On the other hand, the value of acquittal may be sufficient to lead a defendant to go to trial even when the "objective" expected value of trial is less than that of pleading.

has got a ten-year maximum than two counts of 15. Is that right?

The Witness: Yes, sir.

Plea Tr. at 17. The district court relied on this as evidence in support of its conclusion that Teller would not have refrained from pleading guilty if he had been correctly advised. This passage does not logically exclude, and it may arguably support, Teller's present assertion that his reason for pleading was that he thought he would get thirty years whether he won or lost on the defense of not guilty by reason of insanity. If we were sitting as triers of fact we might have so interpreted this passage. However, "it is not our role to play district judge," *Taliferro v. Augle*, 757 F.2d 157, 160 (7th Cir.1985). The interpretation placed on the passage by the district court is also plausible, and so we cannot hold clearly erroneous the conclusion drawn by the district court, that Teller would not have refrained from pleading guilty if he had been correctly advised. *Anderson v. City of Bessemer City*, — U.S. —, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).[7]

 The second factor the district court considered was Teller's failure to assert his innocence. Four other circuits have concluded that an assertion of innocence is a condition precedent to a post-conviction showing of manifest injustice,[8] but this circuit has not imposed such a requirement. Thus the district court treated the failure to so assert as a factor to be weighed in determining whether there is manifest in-

justice in allowing the plea to stand and not as a prerequisite to relief. This is correct, but it seems to us that Teller may have adequately asserted his innocence—at least in the context of an insanity plea. The district court made much of Teller's admission at the plea hearing that he remembered hitting the elder Steidl. However, Teller's response to a follow-up question might be interpreted to indicate that this admission was based on a recollection of what Teller's wife told him he did and not on Teller's memory of the actual events. *See* Plea Tr. at 15–16. In response to questions from the court at the evidentiary hearing, his attorney did assert Teller's innocence. *See* Tr. at 52.

### III.

Even if we were to conclude that the district court erred in evaluating both these additional factors, which we do not, we would not reverse. We believe the advice given was adequate, though only barely. Further, we do not think Teller has shown "manifest injustice," much less that the district court abused its discretion in determining there was no manifest injustice requiring withdrawal of the plea to correct. The evidence against him was strong. *Cf. United States v. Wright*, 407 F.2d 952, 954–55 (7th Cir.1969) (no abuse of discretion to deny presentencing motion to withdraw guilty plea where evidence against defendant was strong). Further, his chances of prevailing on the insanity de-

---

7. It is for this reason that we need not discuss Teller's contention that in considering this factor the district court applied the wrong standard. The court used the term "critical factor" in discussing whether Teller would not have pled if properly informed. Teller argues that the misinformation need not be a "critical factor" because the plea is invalid so long as it rests "in any significant degree" on the defendant's misunderstanding, citing *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971), or the misunderstanding played "a substantial part" in the plea decision, citing *United States v. Becklean*, 598 F.2d 1122, 1125 (8th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 135, 62 L.Ed.2d 87 (1979). Teller Br. at 12 n.*. We think the district court's finding that Teller would not have refrained from pleading, which we believe to be supported by the evi-

dence and not clearly erroneous, implies that the plea did not rest to "any significant degree" or in "substantial part" on the incorrect advice and any misunderstanding it may have generated. *See also Strickland v. Washington*, 104 S.Ct. at 2067–69 (error by counsel not "ineffective assistance" unless there is a reasonable probability that but for the error the result would have been different).

8. *See, e.g., United States v. Tiler*, 602 F.2d 30, 35 (2d Cir.1979); *Smith v. United States*, 324 F.2d 436, 440 (D.C.Cir.1963), *cert. denied*, 376 U.S. 957, 84 S.Ct. 978, 11 L.Ed.2d 975 (1964); *Criser v. United States*, 319 F.2d 849, 850 (10th Cir. 1963) (per curiam); *Klingstein v. United States*, 217 F.2d 711, 712–13 (4th Cir.1954) (per curiam).

**580**

fense were slight. *Cf. Hammond v. United States*, 528 F.2d 15, 16 n. 1 (4th Cir. 1975) (rejecting defendant's challenge to guilty plea based on allegation he was misadvised as to insanity defense when told by attorney he would spend life in mental institution if successful, on ground that trial court had found defendant competent, and so defense was not, in fact, available). Teller is probably better off than if he had gone to trial in the hope of prevailing on the insanity defense. It is not manifestly unjust to fail to allow him to withdraw his guilty plea. For these reasons, the Order of the district court is AFFIRMED.