816 F.2d 673
 22 Fed. R. Evid. Serv. 1587
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Phillip N. ADERS, a/k/a Chick, Defendant-Appellant.
 No. 86-5127.
 United States Court of Appeals, Fourth Circuit.
 Argued March 4, 1987.
Decided April 10, 1987.
 
 Before RUSSELL and HALL, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 Joel Hirschhorn, for appellant.
 Max Oliver Cogburn, Jr, Chief Assistant United States Attorney (Charles R. Brewer, United States Attorney, on brief), for appellee.
 PER CURIAM:
 
 
 1
 This case concerns the parameters of the insanity defense under recent revisions in federal law. Appellant Phillip Ader was charged with four counts of narcotics violations and one count of kidnapping, to all of which he interposed the insanity defense. Ader was acquitted of kidnapping and one count of conspiracy to distribute marijuana; he was convicted on another count of conspiracy to distribute marijuana and two counts of possession with intent to distribute marijuana. He now appeals his convictions both as to the substantive offenses and as to his affirmative defense of insanity. We affirm.
 
 I.
 
 2
 Ader was an associate of Kay Huggins, a drug trafficker who was transporting marijuana in his motor home from the Gulf area of Louisiana to New York. When Huggins' motor home developed problems he arranged to store 900 pounds of the marijuana for a few weeks with Leonard Reynolds, a drug trafficker who lived in Mt. Holly, North Carolina. However, Reynolds and his associate Rollins Frazier stole Huggins' marijuana and moved it to a mini-storage warehouse in Kingsport, Tennessee. When Huggins discovered the theft he called in Ader and another associate known as "Jim Bob." They took Reynolds to a cabin in the woods where they gave him a polygraph examination and Jim Bob beat Reynolds. Reynolds admitted stealing the marijuana and revealed its location. Reynolds was then released, and Huggins and Ader went to Kingsport with Frazier to retrieve the goods.
 
 
 3
 Reynolds, apparently shaken by his experience, called the police in Kingsport. He told them about the beating and the marijuana stored in the warehouse, and also said that Frazier had been kidnapped. Reynolds surrendered himself to the police the next day.
 
 
 4
 After the drug traffickers retrieved the marijuana in Kingsport they returned to Charlotte, North Carolina, where they released Frazier. About two weeks later, on September 4, 1985, the Charlotte police, acting on information from a confidential source, located Ader, surveilled him for a while, and then arrested him in his car. During a search of Ader and of the car incident to the arrest, the police found a warehouse key and receipt which led to the discovery of about 60 pounds of marijuana and assorted drug paraphernalia in a mini-storage locker.
 
 
 5
 Reynolds and Frazier negotiated plea agreements and testified for the government at Ader's trial. Ader's sole witness, other than himself, was Dr. Milton Burglass, an expert in psychiatry, neurophysiology, and medicine. Burglass testified that Ader had smoked marijuana nearly every day since 1943; that in the 1950s Ader was involved with heroin and other injectable or opiate drugs; that in 1959, while serving a federal prison sentence, Ader had participated in a drug research program administered by the Central Intelligence Agency that involved LSD and other controlled substances; that between 1959 and 1984 Ader may have consumed over 3,000 doses of LSD; and that Ader frequently used marijuana, LSD, and cocaine in conjunction with each other. Dr. Burglass then testified that Ader had a severe mental disease characterized as substance abuse disorder, marijuana intoxication, and physiological damage to the brain.[1] Burglass attempted to testify that because of this mental disease Ader could not appreciate the wrongfulness of his acts, but the court excluded this testimony.
 
 II.
 
 6
 We can dispense quickly with many of the issues Ader raises on appeal. At trial Ader apparently admitted to his participation in the specific drug operations for which he was convicted. Therefore we find it unnecessary to address the assignments of error that bear only on his guilt or innocence of those crimes. These alleged errors include the admission of Reynold's and Frazier's plea agreements including reference to their participation in the Federal Witness Protection Program, see United States v. Melia, 691 F.2d 572 (4th Cir.1982), and the jury instruction on the defendant's credibility.
 
 
 7
 Similarly, we need not address the court's alleged errors in failing to suppress the fruits of the search incident to the arrest because these again relate to a crime in which Ader admitted participation. Ader makes no representation that but for the court's failure to suppress he would not have made this admission.
 
 
 8
 Further, we need not address the court's alleged error in admitting hearsay testimony regarding Frazier's statements to his then-attorney. Those statements have relevance only to the kidnapping count, and Ader was acquitted of that charge.
 
 III.
 
 9
 Ader asserts several errors related to his use of the insanity defense, and these are not affected by his in-court admission. The first alleged error concerns remarks made by the government during closing argument. In the initial opening remarks the prosecutor made the following comments:
 
 
 10
 Let me remind you of one other thing, and that is, during all of the testimony concerning it, you didn't hear the testimony of a single defense witness that knew him or associated with him on an everyday basis. Where were his neighbors? Where were his relatives? Where are his friends that could come in here and shed some light on how he acted daily. No, instead, you have one witness from Harvard--well paid--who comes in here and gives you exactly what you would need to hear, if you can believe it, to effectuate a mental defense. Why couldn't the other people come and tell you how he acted on a daily basis? You know, did he run around the neighborhood without clothes or did he slam doors or kick out windows, or did he yell and scream, or where were the ordinary people that know him? The doctor doesn't know him. This doctor didn't know him. The government's doctor didn't know him. Nobody that was with him during the times in question came in to testify.
 
 
 11
 On rebuttal the prosecutor referred again to Ader's failure to produce additional witnesses, other than just the defendant and a psychiatrist. The prosecutor also attacked the psychiatrist, Dr. Burglass, as shown in the following exchange:
 
 
 12
 MR. COGBURN: Then you get Dr. Burglass. No report filed by him at all.
 
 
 13
 MR. HIRSCHHORN: I object. Dr. Burglass was not under a duty to file a report with the court, and that is misleading.
 
 
 14
 THE COURT: It is a fact he did not file a report.
 
 
 15
 MR. HIRSCHHORN: He doesn't have to file a report.
 
 
 16
 THE COURT: I understand, but he didn't file one. Overruled.
 
 
 17
 MR. COGBURN: He doesn't have to file a report, but wouldn't it be nice if he knows the fellow is up there being examined, if he wanted him to have the information Dr. Burglass had, if they really wanted him to have the information, wouldn't it be nice if they had sent the report up there, if they had gotten this report?
 
 
 18
 Finally, the prosecutor closed his rebuttal as follows:
 
 
 19
 Mr. Hirschhorn wants to bring up that there are other charges out here, I guess saying, "You let him go today, and somebody else will get him tomorrow." Well, if this jury passes on insanity today, no telling what might happen to him as to the other charges and other acts Mr. Ader has committed or will commit. (emphasis added).
 
 
 20
 Contrary to Ader's contention, the first set of quoted remarks did not impermissibly shift the burden of proof. Under 18 U.S.C. Sec. 20(b) (1982 & Supp. III) the defendant has the burden of proving insanity. We also see no reversible error in the government's comment on the small number of defense witnesses. See United States v. Schultz, 698 F.2d 365 (8th Cir.1983) (no error in government's remark concerning defendant's failure to call available alibi witness).
 
 
 21
 Similarly, we find no reversible error in the second set of quoted remarks concerning the fact that Dr. Burglass did not file a report. The fact that Burglass was not required to file a report, but that the government's doctors were required to file reports under Fed.R.Crim.P. 16(d) and the Jencks Act, 18 U.S.C. Sec. 3500, apparently was brought out to some extent during cross-examination of the witnesses, and the remark was therefore appropriate as a means of attacking Dr. Burglass' credibility. The fact that Dr. Burglass had no legal obligation to file a report was further brought out during the quoted exchange.
 
 
 22
 Finally, the last three words of the third set of quoted remarks are indisputably improper because they direct the jury to consider whether the defendant will commit future crimes if he is not convicted of the present charges. Although the court initially overruled the objection to this remark, charged the jurors, and excused them for the night, the court called the jurors back the following morning and gave them a curative instruction regarding future crimes. It would have been preferable if the court had given the curative instruction immediately following the improper remark, but we cannot say that the delay was so great as to constitute reversible error, especially given the isolated nature of the impermissible remarks.
 
 IV.
 
 23
 Ader next contends that the court erred in allowing Dr. Burglass to testify that Ader suffered from a severe mental disease but prohibited him from testifying that Ader was unable to appreciate the wrongfulness of his acts. Under 18 U.S.C. Sec. 20(a) (1982 & Supp. III), the affirmative defense of insanity requires proof that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his act." And under Fed.R.Evid. 704(b):
 
 
 24
 No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.
 
 
 25
 Few courts have yet had an opportunity to explore the scope of Rule 704(b). In the only case in this circuit addressing the rule, United States v. Mest, 789 F.2d 1069 (4th Cir.), cert. denied, 107 S.Ct. 163 (1986), we affirmed the impropriety of the question: "Do you have an opinion as to whether or not the defendant at the time of this alleged event could by virtue of his mental condition, discern the wrongfulness of his behavior and had the capacity to conform his behavior to the requirements of the law should he have so chosen?" Id. at 1071. Although in Mest we were primarily concerned with the retroactive application of Rule 704(b), we discussed the scope of the rule by citing its legislative history. Id. at 1072 n. 2. That history shows congressional intent that psychiatrists be limited to testifying about medical concepts, not legal concepts.
 
 
 26
 For example, juries should not hear conflicting psychiatric testimony that the defendant is "sane" or "insane," or that he does or does not meet the relevant legal test for insanity. Id. The psychiatrist is limited to testifying as to whether or not, in his opinion, the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been. Id. In consonance with this legislative history the Advisory Committee notes to Rule 704 illustrate permissible and impermissible questions: "The question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed."
 
 
 27
 Ader suggests that the ultimate issue--the only question Dr. Burglass could not answer--was "Was the defendant insane?" We reject this suggestion as fatuous. The ultimate issue is defined by the language of the statute setting out the defense, not by a shorthand expression. Ader next suggests that if Dr. Burglass was permitted to express an opinion as to the first half of the issue, "Did Ader suffer from a severe mental disease?" he should equally have been permitted to express an opinion as to the second half of the issue, "Was Ader able to appreciate the wrongfulness of his acts?" This argument offers an attractive symmetry, but examination of the statute shows that it is not symmetrically composed. The inability to appreciate the wrongfulness of one's acts must be the result of a severe mental disease or defect. The statute thus imposes a sense of directionality on its parts, and makes one part dependent upon the other. The legislative history of Rule 704(b) shows clear congressional intent to permit expert testimony as to the predicate medical portion of the offense--the existence in the defendant of a severe mental disease or defect. It shows no similar intent to permit expert testimony as to the resulting legal portion of the offense--the defendant's inability to appreciate the wrongfulness of his acts. If we were to force the statute into a symmetrical frame as Ader suggests, we would emasculate Rule 704(b).[2]
 
 
 28
 Our conclusion does not leave the defendant without means of persuading the jury of his inability to appreciate the wrongfulness of his acts. In addition to expressing an opinion that the defendant suffers from a severe mental disease or defect, the expert may testify as to the characteristics of that disease or defect, if any. Mest, supra, at 1172 n. 2. These characteristics are merely an amplification of the predicate medical portion of the defense. The court recognized this and gave Ader great latitude in examining Dr. Burglass. Under Mest, Ader could have asked Dr. Burglass to testify about the characteristics of Ader's mental disease because that is a medical question, but he could not testify that Ader himself manifested those characteristics if that was a legal question. Thus, if an inability to appreciate the wrongfulness of one's conduct were a legitimate characteristic of Ader's mental disease, Dr. Burglass could have testified as to that medical fact. But Dr. Burglass could not state the legal conclusion that Ader himself was unable to appreciate the wrongfulness of his acts. The record shows that Ader asked Dr. Burglass, "Is one of the characteristics of the mental disease or defect which you have diagnosed, Mr. Ader's inability to appreciate the nature or the wrongfulness of his acts?" (emphasis added). The court properly sustained the objection to this question because it required Dr. Burglass to state an opinion about Ader's own mental state or condition rather than merely reciting, in an abstract medical way, a characteristic of Ader's mental disease or defect.
 
 
 29
 Our emphasis on the exact phraseology of the question may appear to be putting form before function, but this is the essence of Rule 704(b). As we said in Mest at 1071-72:
 
 
 30
 [T]he change in the rules of evidence effected by the enactment of Rule 704(b) does not receive less or different testimony in order to convict the offender but, rather, changes the style of question and answer that can be used to establish both the offense and the defense thereto. Every actual fact concerning the mental condition of the defendant presentable by the defense's psychiatrist or, for that matter, the government's psychiatrist is still as admissible and as required after the enactment of 704(b) as before. The change, rather, is to whether either of these categories of witnesses can instruct the trier of fact (in this instance, the jury) as to what its findings should be on the factual questions about which the witness could before and can now testify.
 
 
 31
 In other words, Rule 704(b) effected a procedural change concerned with the phraseology of questions concerning mental state or condition.
 
 
 32
 Because Ader improperly phrased his question to Dr. Burglass and tried to elicit an opinion on Ader's own ability to appreciate the wrongfulness of his acts rather than the characteristics of Ader's mental disease or defect, we find no error in the court's exclusion of this opinion.
 
 V.
 
 33
 Ader's final assertion of error regarding the insanity defense concerns the form used for the jury's notation of verdict. 18 U.S.C. Sec. 4242(b) (1982 & Supp. III) now requires the use of a special verdict whenever the defendant pleads insanity:
 
 
 34
 If the issue of insanity is raised by notice as provided in Rule 12.2 of the Federal Rules of Criminal Procedure on motion of the defendant or of the attorney for the Government, or on the court's own motion, the jury shall be instructed to find, or, in the event of a nonjury trial, the court shall find the defendant--
 
 
 35
 (1) guilty;
 
 
 36
 (2) not guilty; or
 
 
 37
 (3) not guilty only by reason of insanity.
 
 
 38
 A verdict of not guilty by reason of insanity empowers the court to commit an acquitted defendant to a mental hospital. See United States v. Teller, 762 F.2d 569 (7th Cir.1985).
 
 
 39
 The court's jury instructions and verdict notation form did not offer these three choices for each charge. Instead, for each count the court first required the jury to indicate whether they found the defendant guilty or not guilty. The verdict form then read, "If the jury has answered this Count 'Guilty,' then does the jury find the Defendant 'Not Guilty' only by reason of insanity?" (emphasis in original). Ader contends that this form was improper as a matter of law because it did not conform to section 4242(b), and because it was potentially confusing to the jury.
 
 
 40
 We have some reservations about the court's verdict notation form because it implies that "not guilty by reason of insanity" is a subspecies of "guilty." Section 4242(b) appears to set up three co-equal verdict choices rather than a hierarchy of choices. Further, the statute requires that whenever the jury determines that the defendant is not guilty, they must signify whether their acquittal is based on insanity or on the merits; the court's verdict notation form deprives the court of this information.
 
 
 41
 Nonetheless, we cannot say that the deviations in this case were sufficient to prejudice the defendant and require reversal. The jury here found Ader guilty on three counts and dutifully noted that for these three counts he was not "not guilty only by reason of insanity." The jury also found him not guilty on two counts and, in accordance with their instructions, did not indicate whether these acquittals were on the merits or by reason of insanity. We can infer, however, from the verdicts as a whole, that if the court had used a verdict notation form closer to that suggested by section 4242(b), the jury would have found Ader guilty on three counts and not guilty (on the merits) on two counts. Therefore any error in the verdict notation form is harmless in this case.
 
 
 42
 For the reasons stated above, the judgments of convictions of the appellant are
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 Burglass listed the psychiatric disorders as catalogued in the Diagnostic and Statistical Manual of the American Psychiatric Association (3d ed. 1980): DSM III 305.31, 304.31, 292.11, 305.20, 292.12, 292.81, and 301.70
 
 
 [2]
 Similarly, if we were to force the statute into a symmetrical frame and prohibit expert testimony as to the existence of a severe mental disease or defect, we would emasculate the insanity defense